**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
CHRISTINA ALFANDARY, JEFFREY          :   **Civil Action No.**
HANSEN, LAURIE VICARI, TIMOTHY        :
MCCARTHY, AND BILL WILDER,            :
                                      :
                    **Plaintiffs,**   :   **ECF CASE**
                                      :
            v.                        :
                                      :   **COMPLAINT**
NIKKO ASSET MANAGEMENT CO., LTD.      :
and TAKUMI SHIBATA,                   :
                                      :
                    **Defendants.**   :
                                      :
------------------------------------------------------------------------x

      Plaintiffs, Christina Alfandary, Jeffrey Hansen, Laurie Vicari, Timothy McCarthy, and Bill

Wilder, by their attorneys Crosby & Higgins LLP, complaining of Defendants, Nikko Asset

Management Co., Ltd. ("NAM" or the "Company") and Takumi Shibata ("Shibata"), allege upon

information and belief as follows:

<u>**PRELIMINARY STATEMENT**</u>

      1.     This dispute arises from a scheme orchestrated by and between Defendant NAM

and Defendant Takumi Shibata, its current President and Chief Executive Officer, to fraudulently

rig the outcome of a 2009 employee stock option plan (the "2009 Stock Option Plan" or the "Plan")

offered to Plaintiffs and hundreds of employees working around the world, including at least 21

employees working in the New York offices of NAM's wholly owned and controlled subsidiary,

Nikko Asset Management Americas, Inc. ("NAMA").

      2.     As set forth in detail below, the purpose of Defendants' fraudulent scheme was

three-fold.  First, Defendants sought to minimize the amount of money that participants could

receive from the Company by exercising their right, pursuant to the terms of the 2009 Stock Option

Plan, to sell back to the Company the stock acquisition rights ("SARs") previously granted to them, for which 3,300 ordinary shares of NAM were allotted to each unit, in the event that the Company did not conduct an initial public offering ("IPO") by January 21, 2015. Defendants accomplished this objective by ensuring that the 2015 "independent" calculation of the Company's "fair market value" mandated by the terms of the 2009 Stock Option Plan was rigged to produce a false and misleadingly low value. Indeed, Defendants' valuation falsely claimed that the units of SARs awarded to hundreds of employees pursuant to the 2009 Stock Option Plan were suddenly worthless.

3.     Second, Defendants sought to defraud participants in the 2009 Stock Option Plan that were no longer employees of the Company, including the Plaintiffs in this action, by forcing them to accept a fraudulent, bad faith "offer" by Defendant NAM in July 2015, to repurchase all of the SARs previously granted to them for the equivalent of one yen per share, based on Defendants' fraudulent valuation pursuant to which the SARs were deemed to be worthless. According to the false and misleading representations made by Defendant Shibata on behalf of the Company, if former employees holding SARs pursuant to the 2009 Stock Option Plan refused the opportunity to have their SARs repurchased by the Company for one yen per share, then all of the SARS awarded to them pursuant to the 2009 Stock Option Plan would be forfeited and automatically deemed "extinguished."

4.     Third, Defendants schemed to produce a fraudulent and artificially low valuation of the Company's shares in order to justify the creation of a new employee stock plan, this one heavily weighted to favor Defendant Shibata, who had only been appointed as President and Chief

Executive Officer of the Company in January 2014, with an artificially low strike price and a minimal vesting period—essentially, an employee stock option plan that would almost instantaneously enrich Defendant Shibata with millions of dollars of valuable "in the money" stock options, all at the expense of hundreds of current and former employees holding SARs granted to them pursuant to the 2009 Stock Option Plan.

5.     Defendants' fraudulent scheme succeeded in achieving all of its wrongful objectives, wiping out as much as $50 million dollars or more of SARs granted to hundreds of current and former employees pursuant to the 2009 Stock Option Plan, including more than $10 million dollars worth of SARs held by the Plaintiffs.  Defendants' wrongful conduct, among other things, violates federal securities laws, constitutes tortious interference, breach of fiduciary duty and breach of contract, and gives rise to the claims set forth below.

6.     To summarize, in or about July 2009, in the midst of a global financial crisis, Sumitomo Mitsui Trust Bank ("SMTB") acquired Defendant NAM, a registered investment adviser with the United States Securities and Exchange Commission ("SEC") since at least 1999, from its then-owner, Citibank, which was under pressure at the time from the U.S. government to sell non-essential assets, including Defendant NAM.  The price (and adjusted full value) paid by SMTB, under these extraordinary circumstances, was approximately 123 billion yen, inclusive of free cash, fully-vested options, and employee-owned shares. This figure equated to approximately 625 yen per share of Defendant NAM.

7.     At the time of the acquisition in 2009 by SMTB, all of the Plaintiffs were employed as senior managers, either directly with Defendant NAM, or otherwise at its New York subsidiary,

3

NAMA.  Specifically, Plaintiff Timothy McCarthy was employed as the Chairman and Chief Executive Officer of Defendant NAM; Plaintiff Bill Wilder was employed as President of Defendant NAM; Plaintiff Christina Alfandary was employed as a Senior Director of NAMA; Plaintiff Jeffrey Hansen was employed as a Senior Fund Manager and Managing Director of NAMA; and Plaintiff Laurie Vicari was employed as the Chief Compliance Officer for NAMA.

8.      In order to provide for the long-term welfare of Company employees, and in order to induce Plaintiffs and numerous other key employees working directly for the Company and at its subsidiaries around the world, to stay on with the Company after the acquisition, SMTB worked side by side with Defendant NAM's senior management team, including in particular Plaintiffs McCarthy and Wilder, in order to create a new employee stock option plan for the Company.  This was especially important because the Company's existing employee stock option plan was terminated in connection with SMTB's acquisition, leaving Defendant NAM without a long-term mechanism for allowing employees to participate in and acquire ownership of the Company at which they were being asked to stay.

9.      Accordingly, in or about Fall 2009, Defendant NAM announced the creation of the 2009 Stock Option Plan, which was to be administered directly by the Company using its "best efforts" not to take any steps that would disadvantage participants.  The strike price for the 2009 Stock Option Plan was set at 625 yen per share, the price SMTB had shortly before paid to acquire 100% of Defendant NAM.

10.     Thereafter, Defendant NAM awarded SARs to each of the Plaintiffs and to approximately 299 employees worldwide, including 21 working at NAMA in New York. In order

4

to provide employees with the opportunity to participate in the 2009 Stock Option Plan, including several Plaintiffs and dozens of other United States citizens working for NAM and its subsidiary NAMA at the time, NAM caused materials and enrollment forms to be sent from its Tokyo offices to locations throughout the United States, including directly to the employees working in the New York office of NAMA.

11.     As set forth in the 2009 Stock Option Plan, participating employees, including all of the Plaintiffs herein, were granted the right to exercise their SARs based on the market price, less the designated strike price (625 yen per share), in the event that the Company became publicly traded.  Alternatively, if the Company did not go public by January 21, 2015, participants were granted the express right to sell the SARs back to the Company in specified amounts and on specified dates at an independently and externally determined "fair market value," less the designated strike price of 625 yen per share.

12.     As a result, if NAM did not timely go public by January 21, 2015, "fair market value" would become the dispositive metric in determining the value of the shares of the company under the 2009 Stock Option Plan for purposes of participants' right to sell the SARs back to the Company.

13.     Between SMTB's purchase of NAM in July 2009 at a price equivalent to 625 yen per share, and late 2014, several valuations of NAM were performed that reflected a per share price that was materially higher than 625 yen per share for the Company.

14.     For example, in or about mid-2011, SMTB worked with numerous investment banks, including UBS AG Group ("UBS"), in preparation for a possible public offering of shares

in Defendant NAM.   As part of those discussions, Defendant NAM's investment bankers, including UBS, agreed that the minimum valuation for the Company would be approximately 750 yen per share.   Likewise in or about 2011, SMTB internally valued Defendant NAM at approximately 145 billion yen, and used that valuation to adopt another employee stock option plan, this time with an exercise price set at 737 yen per share.

15.     Thereafter, beginning in or about early 2014, and continuing until at least early 2015, the intranet website of Defendant NAM's Human Resources Department began advising employees, including several of the Plaintiffs, that the Company expected an IPO price of 737 yen per share and an anticipated realization on the SARs units awarded pursuant to the 2009 Stock Option Plan of 900 yen per share.

16.     Consistent with the valuation estimates reported by the Human Resources Department at NAM, in or about summer 2014, Duff & Phelps Corporation ("Duff & Phelps"), an internationally renowned valuation firm, independently calculated the fair market value of NAM at a price equal to approximately 853 yen per share.

17.     The steady increase in the value of Defendant NAM between SMTB's acquisition in 2009 and the beginning of 2015, as reflected in numerous internal and independent valuations conducted throughout that period, was fully consistent with numerous developments taking place in the markets generally, as well as developments taking place that specifically related to the business of Defendant NAM.

18.     These market and Company specific developments included, among other things, a dramatic rise in the value of the Tokyo stock market, a significant upward increase in the market

EBIDA multiples being applied to companies listed on the Tokyo Stock Exchange, and large increases in Defendant NAM's assets under management ("AUM"), equity and cash and seed investments, all of which was reflected on Defendant NAM's audited financial statements published on its website.

19.    In the meantime, in or about January 2014, Defendant Shibata became the Chief Executive Officer and President of Defendant NAM, after previously resigning from his position as Chief Operating Officer of Nomura Holdings Group in 2012 in the wake of a widely reported insider trader scandal. From the outset, Defendant Shibata made little effort to mask his obvious contempt for Defendant NAM's prior senior management team, including several of the Plaintiffs in this action, and spuriously claimed on more than one occasion that prior management had severely damaged the Company.

20.    Defendant Shibata would purportedly state in management meetings and various other internal sessions that he wanted to ensure that Defendant NAM's prior senior management team realized as little value as possible from existing stock option plans, including the 2009 Stock Option Plan.

21.    Upon information and belief, upon learning of the Duff & Phelps valuation prepared in Summer 2014, Defendant Shibata directed that it not be further issued and that it be left in draft form, apparently because he was upset about the valuation of the Company, which Defendant Shibata complained was far too high.

22.    As it turns out, the remainder of 2014 and January 2015 came and went without an IPO and to this day the Company has still not gone public.  As a result, Defendant NAM was

required to determine the fair market value of the Company in accordance with the terms of the 2009 Stock Option Plan.  Specifically, the 2009 Stock Option Plan required that three "independent external evaluators" ("Evaluators") each calculate the fair market value of NAM, and that the fair market value of the Company be the average of the three calculations.  Pursuant to the express terms of the 2009 Stock Option Plan, the fair market value of NAM was to be calculated during the period between June and July 2015.

23.    Notwithstanding the foregoing obligations set forth in the 2009 Stock Option Plan, which expressly included the obligation to use "best efforts" not to disadvantage participants in the administration and interpretation of the plan, in or about February 2015, Defendants embarked on a scheme to fraudulently rig the outcome of the fair market value calculation in order to produce an artificially low repurchase price for the SARs granted pursuant to the 2009 Stock Option Plan and to defraud former employees, which were among the largest holders of the SARs granted pursuant to the 2009 Stock Option Plan, into liquidating their SARs based on the fraudulent valuation, all while enriching Defendant Shibata with artificially low-priced employee stock options of his own.

24.    First, Defendants saw to it that no one with units of SARs under the 2009 Stock Option Plan was meaningfully involved in the fair market valuation process, destroying any real prospect that the valuation process would be impartial, while enhancing the likelihood of the Company getting the lowest fair market value calculation possible.

25.    Second, Defendants arbitrarily determined the criteria used in the selection of the three Evaluators, and did so in bad faith and in a manner contrary to the requirements of the 2009

Stock Option Plan.  In fact, Defendants ultimately selected three Evaluators that did not come close to meeting any reasonable standard of what it means to be an "independent" or "external" evaluator, as required by the 2009 Stock Option Plan.

26.     To illustrate, the first evaluator Defendants selected was Plutus Consulting ("Plutus"), a relatively unknown Japanese firm with little, if any, experience in carrying out fair market value calculations for privately held asset management companies or firms with an international footprint the size of NAM's.   On information and belief, Defendant Shibata handpicked Plutus after his earlier retention of that firm to design a new, long-term incentive stock option program for him and the rest of his management team, rendering Plutus neither "independent" nor "external" to the Company.

27.     Likewise, the second evaluator Defendants chose was UBS, who was the long-time investment banker for SMTB and Defendant NAM, and thus clearly not an "independent" evaluator.  On information and belief, Defendants chose USB because they believed UBS would be motivated to follow Defendant Shibata's guidance on what the fair market value calculation should be in order to strengthen its relationships with SMTB and Defendant NAM and generate new business assignments from them, including the opportunity to later lead a renewed effort to conduct an IPO for the Company.

28.     Finally, Defendants appointed PWC as the third Evaluator, despite that fact that PWC lacked independence because it was Defendant NAM's prior auditor and at the time of the valuation was already receiving substantial fees from the Company for audit services rendered on its publicly-offered mutual fund—work which was at risk of being moved to another firm.  PWC

had been previously replaced as the corporate auditor of Defendant NAM at the demand of SMTB and risked losing the mutual fund audit business as well.

29.     Significantly, Defendants specifically excluded Duff & Phelps from the selection process, which is hardly surprising in retrospect given that firm's 853 yen per share valuation of NAM several months earlier.

30.     Third, Defendants took steps to constrain the scope of the engagement of the Evaluators for the purpose of controlling and rigging the results of their work, and did so by failing to report required information to the Evaluators, and on information and belief, in some cases by reporting inaccurate information to the Evaluators.

31.     As a result, the Evaluators were required to perform their valuation based on a very limited set of data and materials, and the entire valuation process was structured in a way such that the Evaluators would have little, if any, access to management, contrary to any reasonable independent valuation procedures.

32.     Upon information and belief, Defendants also provided the Evaluators with a diluted number of ordinary shares of the Company to be used as the denominator to calculate "fair value" per share, notwithstanding the facts that no dilution was possible under the 2009 Stock Option Plan in the absence of an IPO, and notwithstanding the fact that dilution had never been taken into account in any prior valuation of the Company.

33.     Upon information and belief, neither the Duff & Phelps valuation, nor any other valuation of Defendant or any of its subsidiaries or joint ventures, nor any forecasts or projections past one year, nor any free cash balances were given to the Evaluators, contrary to customary

10

professional standards. These actions and other actions described further below all were taken to generate an inaccurate, misleading, and artificially low fair market value calculation from the Evaluators.

34.     In a further effort to push the fair market value calculation downward, Defendants caused the fair market value calculation to be carried out in or about April 2015, not during June and July 2015, as required under the express terms of the 2009 Stock Option Plan.  On information and belief, Defendants wanted the Evaluators to have less information about NAM's actual performance during 2015 to base the valuation on than they would have had if the valuation were to be performed later in the year.

35.     In or about July 2015, Defendants announced that the Evaluators had reached an average fair market valuation for Defendant NAM of 617 yen per share, which was 8 yen per share below the 625 yen per share valuation ascribed to SMTB's 2009 purchase of NAM and the strike price of the 2009 Stock Option Plan.

36.     Thereafter, Defendants sent packages containing this news and related forms to all participants awarded units of SARs pursuant to the 2009 Stock Option Plan. Those packages informed the affected individuals, including the Plaintiffs in this action, that if they requested, NAM, despite the 617 yen per share valuation, would generously purchase all of their SARs for one yen (i.e., less than one penny) per share.

37.     Critically, the communication sent by Defendants also advised those participants who, like Plaintiffs, left the company prior to the time of the offer, that if they did not act on the opportunity to request a repurchase of their SARs before August 21, 2015, then they would

11

automatically become non-exercisable and extinguished.  In other words, Defendants advised that all of the hard-earned SARs granted pursuant to the 2009 Stock Option Plan and held by former employees of the Company would be automatically forfeited.  As events transpired, in August 2015, Plaintiff Jeffrey Hansen sold his units of SARs back to NAM for a nominal amount. The remainder of the Plaintiffs in this action protested the valuation and otherwise refused to comply. All of them were defrauded.

38.    As set forth below, the 2009 Stock Option Plan obligated Defendants at all times, as plan fiduciaries, to use their "best efforts" not to disadvantage plan participants in the administration and interpretation of the plan.  Defendants did not use their best efforts not to disadvantage participants in the 2009 Stock Option Plan.  Instead, Defendants conducted themselves in precisely the opposite fashion.

39.    The result was a fraudulent valuation of Defendant NAM in July 2015 that was dramatically lower than multiple, documented, independent valuations of the Company performed on numerous occasions between 2011 and 2014—indeed, it was lower even than the valuation of the Company in 2009, when it was sold by Citibank in the midst of a global financial crisis of historic magnitude.

40.    Worse yet, Defendants compounded the wrongdoing by inventing an imaginary non-existent right pursuant to the terms of the 2009 Stock Option Plan to "grant an opportunity" for Plaintiffs, as former employees, to resell all of their SARS back to NAM for the equivalent of one yen per share, even though Defendants had just declared to all of the participants in the 2009 Stock Option Plan that the SARS were currently worthless, with the added, fraudulent, bad faith,

caveat that if the Plaintiffs, as "Retired Persons," did not "accept" the Company's opportunity to request the repurchase for what amounts to one penny per share, then their SARs would be automatically deemed by the Company to be un-exercisable and extinguished.

41.     Defendants' affirmative representation that the 2009 Stock Option Plan authorized the Company to mandate that former employees must have the Company repurchase all of the SARs held by them or otherwise have them automatically deemed extinguished and forfeited, even though the SARs purportedly had no value according to the Company, and even though the Company had not yet conducted an IPO, was entirely false and misleading.  In fact, the 2009 Stock Option allowed no such thing in the absence of an IPO, and set the period of exercisability for the SARs from "January 22, 2012 until January 21, 2020," a continuous and expressly granted right belonging to all participants in the plan, irrespective of their current employment status.

42.     Tellingly, in October 2015, Defendants extended another "one-time voluntary liquidity opportunity" to employee participants in the 2009 Stock Option Plan, presumably because the July 2015 "opportunity" did not garner the response from employee participants that Defendants had fraudulently schemed for.  Incredibly, the October 2015 offer set the purchase price at 677 yen per share, which constituted a premium of 52 yen per share—more than 50 times higher than the July 2015 offer made just three months earlier.

43.     Defendants did not extend the October 2015 offer to former employees, despite the fact that they continued to hold SARS pursuant to the express terms of the 2009 Stock Option Plan. For certain, the fact that Defendants extended a second offer to employee participants in the 2009 Option Plan with drastically better terms just three months after the July 2015 offer, evinces not

13

only the fraudulent nature of Defendants July 2015 valuation scheme and the forced liquidation of all SARs held by the Company's former employees, but also illustrates Defendants' feckless breach of fiduciary duty and breach of the clear and unambiguous terms of the 2009 Stock Option Plan.

44.    Defendants' conduct egregiously disadvantaged former employees, including Plaintiffs. It was dishonorable—indeed unconscionable—and utterly fell short of any standard of good faith and fair dealing. Accordingly, this action seeks to recover compensatory and punitive damages in order to provide Plaintiffs with what they should have received had Defendants not fraudulently planned and schemed, as they did, in order to rig the outcome of the 2015 fair market value calculation required by the 2009 Stock Option Plan, thereby effectively stealing back Plaintiffs' hard-earned SARs.

## **PARTIES**

45.    Plaintiff Christina Alfandary is a United States citizen and resident of the State of New York. From in or about September 2005 to in or about May 2015, she was employed, among other positions, as U.S. Business Head of NAMA, working in NAMA's offices in New York, New York. In or about February 2010, Defendant NAM allotted Plaintiff Alfandary 19 units of SARS pursuant to the terms and conditions of the 2009 Stock Option Plan. In or about May 2015, Plaintiff Alfandary resigned from NAMA.

46.    Plaintiff Jeffrey Hansen is a United States citizen and resident of the State of New Jersey. From in or about January 2005 to in or about December 2014, he was employed as Senior Fund Manager and Managing Director of NAMA, working in NAMA's offices in New York, New

York.  In or about August 2010, Defendant NAM allotted Plaintiff Hansen approximately 20 units of SARs pursuant to the terms and conditions of the 2009 Stock Option Plan.  In or about December 2014, Plaintiff Hansen resigned from NAMA.

47.     Plaintiff Laurie Vicari is a United States citizen and resident of the State of New Jersey. From in or about November 2007 to in or about October 2014, she was employed as Chief Compliance Officer of NAMA, working in NAMA's offices in New York, New York.  In or about February 2010, NAM allotted Plaintiff Vicari approximately 20 units of SARs pursuant to the terms and conditions of the 2009 Stock Option Plan.  In or about October 2014, Plaintiff Vicari resigned from NAMA.

48.     Plaintiff Bill Wilder is a United States citizen and resident of the State of New York. From in or about May 2004 to in or about March 2013, he was employed as President of Defendant NAM. In or about February 2010, NAM allotted Plaintiff Wilder 1,341 units of SARs pursuant to the terms and conditions of the 2009 Stock Option Plan.  In or about March 2013, Plaintiff Wilder resigned from NAM.

49.     Plaintiff Timothy McCarthy is a United States citizen and resident of the State of California.  From in or about April 2004 to in or about April 2012, he was employed as Chairman and Chief Executive Officer of NAM.   In or about February 2010, NAM allotted Plaintiff McCarthy 1,341 units of SARs pursuant to the terms and conditions of the 2009 Stock Option Plan.  In or about March 2012, Plaintiff McCarthy resigned from NAM.

50.     Upon information and belief, Defendant NAM is a privately held investment management company incorporated in Japan with its principal place of business in Tokyo, Japan.

Upon information and belief, NAM is one of the largest firms of its kind in Japan and Asia and, as of in or about 2015, had approximately 20 trillion yen under management.

51.     Upon information and belief, nonparty SMTB, a Japanese corporation with its principal place of business in Tokyo, Japan, owns approximately 91.6% of NAM. Upon information and belief, nonparty Sumitomo Mitsui Trust Holdings, Inc., a Japanese company whose shares are publicly traded, owns, in turn, 100% of SMTB.

52.     Defendant NAM is also an investment adviser firm registered with the Securities and Exchange Commission ("SEC") since at least August 1999, with a Central Registration Depository ("CRD") number of 110997 and an SEC file number of 801-56686.  According to Schedule A of NAM's most recently filed Form ADV dated June 29, 2017, SMTB is a direct, majority owner and control person of NAM and Defendant Shibata is a direct owner and control person of NAM.  NAM provides investment advisory services in the United States and around the world, including in New York through its wholly owned subsidiary, NAMA.

53.     Upon information and belief, non-party NAMA is a registered investment adviser incorporated in the State of Delaware with its principal place of business in New York, New York. Upon information and belief, Defendant NAM owns 100% of a holding company that itself owns 100% of NAMA.  NAMA is also registered as an investment adviser with the SEC since at least May 2002, with a CRD number of 824 and an SEC file number of 801-60881.  According to Schedule B of NAMA's most recently filed Form ADV dated June 29, 2017, NAM and SMTB are majority owners and control persons of NAMA.

16

54.     Defendant Takumi Shibata, upon information and belief, is a Japanese citizen and resident of Japan, who joined NAM in July 2013 as Executive Chairman. Upon information and belief, from January 2014 to the present, Defendant Shibata has been employed as Chief Executive Officer and President of Defendant NAM.  According to Schedule A of Defendant NAM's most recently filed Form ADV, dated June 29, 2017, Defendant Shibata is a direct owner and control person of NAM.

## JURISDICTION AND VENUE

55.     Plaintiffs bring this action under Section 10(b) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b), Rule 10b-5, 17 C.F.R. 240.10b-5, and under New York law.

56.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as there is a "federal question" involved in this case. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1337(a), because this action is a proceeding arising under an Act of Congress regulating commerce, specifically, Section 10(b) of the Securities Exchange Act of 1934 ("SEA"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder. This Court also has subject matter jurisdiction pursuant to Section 27 of the SEA, 15 U.S.C. § 78aa, since this action seeks to enforce a liability and/or duty created by the SEA and rules and regulations thereunder.  This court also has subject matter jurisdiction over this action pursuant to Section 29(a) of the SEA, 15 U.S.C. § 78cc, because any attempt to waive compliance with Section 10(b), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder, is statutorily void.

17

57.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

58.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims raised herein arise from a common nucleus of operative facts and are so related to the original jurisdiction federal claims of securities fraud that they form a part of the same case or controversy under Article III of the Constitution.

59.     This Court has personal jurisdiction over Defendants pursuant to New York Civil Practice Law and Rules Section 302(a)(1), in that Defendants have transacted business within the State of New York and pursuant to Section 302(a)(2), in that Defendants have committed tortious acts within the State of New York, and pursuant to Section 302(a)(3), in that Defendants have committed tortious acts outside the State of New York causing injuries to persons within the State of New York.

60.     In addition, this Court has personal jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because Defendants are subject to the general jurisdiction of a court in the State of New York because NAM maintained and continues to maintain a continuous and systematic presence in the District and engages and has engaged in extensive contacts with the District through its wholly-owned subsidiary NAMA, which operates as an extension of NAM itself.  Defendant NAM has also purposefully sought to avail itself of the rights and benefits of federal securities laws and the laws of New York in prior legal proceedings brought by Defendant NAM in this Court.

18

61.     Additionally, the Court has personal jurisdiction over Defendant NAM pursuant to its most recently filed Form ADV, in which NAM has appointed the Secretary of the SEC as its agent to receive service in the United States for any federal or state action against NAM, in any place subject to the jurisdiction of the United States, arising out of any activity in connection with its investment advisory business that is subject to the jurisdiction of the United States, and that is founded, directly or indirectly, upon the provisions of such acts as the Securities Act of 1933, the Securities Exchange Act of 1934, or any rule or regulation under any of these acts.

62.     Likewise, Defendant Shibata maintains and has maintained extensive contacts with the District, evidenced in part by his correspondences directed to the Plaintiffs in New York described herein, and he has engaged in conduct, as alleged in this Complaint, that caused consequences in the District to the detriment of the Plaintiffs which he knew or should have known was likely.  In addition, Defendant Shibata is a specifically identified control person for Defendant NAM, which is itself a control person concerning non-party NAMA, which is located in New York, all as set forth in regulatory filings.

63.     In addition, this Court has jurisdiction over the Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(C) because jurisdiction is authorized pursuant to a federal statute.  Specifically, Section 27 of the SEA, 15 U.S.C. § 78aa, authorizes worldwide service of process for violations under the SEA and permits jurisdiction to the bounds dictated by due process.

64.     Given the minimal burden on the Defendants, the substantial interests of the forum in protecting its citizens from securities fraud, and the significant interest of Plaintiffs in remedial relief, the exercise of personal jurisdiction over the Defendants is reasonable and comports with

19

the requirements of due process in that it does not offend traditional notions of fair play and substantial justice.

65.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), in that a substantial part of the events giving rise to the claims herein occurred in this District, and pursuant to Section 27 of the SEA, 15 U.S.C. § 78aa, in that Defendants transacted business in this District, acts or transactions constituting the violation occurred in the district, conduct within the District constituted significant steps in furtherance of the violation, and conduct occurring outside of the District had a foreseeable substantial effect within the District.

66.     In addition, Defendant NAM operates its wholly-owned American subsidiary in this District and has done so since 1981. The alleged acts constituting the fraud occurred, at least in part, in this District, including the issuance and dissemination of the materials constituting the forced liquidation of the Plaintiffs' SARs under the 2009 Stock Option Plan, and Defendants' acts of fraud caused detrimental effects to Plaintiffs within the District.

## DETAILED FACTUAL BACKGROUND

### A.     SMTB Purchases Defendant NAM from Citibank

67.     By way of background, in late 2008 and early 2009, in the midst of the global economic crisis unfolding at the time, Citibank was under substantial duress and facing keen financial and regulatory pressures, including pressure from the government, to pay back loans given to Citibank and raise operating capital by selling non-essential assets.  At the time, Defendant NAM was deemed to be a non-essential asset and was therefore put up for sale by Citibank.

68.     Upon information and belief, in or about July 2009, SMTB acquired NAM from Citibank for approximately 123 billion yen, or 625 yen per share for 100% of the shares of the company.  An SMTB press release at the time of the transaction indicated that this 123 billion yen price was composed of approximately 98 billion yen as a value assigned to the business attributable to the cost of all stock options held by two top employees, and all shares owned by NAM's employee stock ownership plan ("ESOP"), as well as excess free cash of approximately 25 billion yen.  Upon information and belief, had the sale taken place in less extreme circumstances, the price for NAM would have been substantially higher.

### B.     The 2009 Stock Option Plan

69.     Shortly after completing the acquisition, SMTB began working with Defendant NAM's senior management team, including in particular Plaintiffs McCarthy and Wilder, in order to create a new employee stock option plan for the Company.

70.     The purpose of the new plan was to provide for the long-term welfare of Company employees, and to induce Plaintiffs and numerous other key employees working directly for the Company and at its subsidiaries around the world, to stay on with the Company after the acquisition.  This was especially important because the Company's existing employee stock option plan was terminated in connection with SMTB's acquisition, leaving Defendant NAM without a long-term mechanism for allowing employees to participate in and acquire ownership of the Company at which they were being asked to stay.

71.     Accordingly, in or about Fall 2009, Defendant NAM announced the creation of the 2009 Stock Option Plan, which was to be administered directly by the Company using its "best

efforts" not to take any steps that would disadvantage participants.  The strike price for the 2009 Stock Option Plan was set at 625 yen per share, the price SMTB had shortly before paid to acquire 100% of Defendant NAM.  Thereafter, Defendant NAM awarded SARs to each of the Plaintiffs and to approximately 299 employees worldwide, including 21 working at NAMA in New York.

72.     As set forth above, the strike price was set in the 2009 Stock Option Plan at 625 yen per share, which corresponded to the purchase price SMTB paid for 100% of the issued share capital, vested options, and ESOP of NAM a short time before.  Pursuant to the 2009 Stock Option Plan, all designated employees, including Plaintiffs, were granted the right to sell their SARs into the market at the market price less the designated strike price (625 yen per share) if NAM conducted an IPO.  Alternatively, if NAM did not go public by January 21, 2015, participating employees were given the right to sell the SARs back to Defendant NAM at the "fair market value" of the SARs less the designated strike price.

73.     Under the standard form of the Agreement on Allotment of Fiscal Year 2009 First Series Stock Options, dated February 8, 2010, ("Allotment Agreement"), the substance of which, on information and belief, was used with all Plan participants, including the Plaintiffs, in the event Defendant NAM did not conduct an IPO by January 21, 2015, those employees who were awarded SARs were entitled to request that NAM purchase their units of SARs, and NAM was required to purchase them, if so requested.

74.     Specifically, Article 12 of the Allotment Agreement, "Right to Request Purchase of Stock Acquisition Rights in case of Delay of IPO" provides that: "in the event that the Company has not implemented the IPO by January 21, 2015, during the period until the IPO has been

implemented, the Grantee can request the Company to purchase the Stock Acquisition Rights if so requested."

75.     Article 12(2) of the Allotment Agreement also provides that the purchase price for the SARs would be calculated "by multiplying (i)(a) the amount equal to the average of the computational evaluation results as to the fair market value per share of the ordinary shares of [NAM] obtained *from three independent external evaluators* appointed by [NAM] less (b) the amount equivalent to the Exercise Price for the [SARs] to be purchased by (ii) the number of shares for Grant with respect to such [SARs] on the date of the purchase thereof." (Emphasis Added). In other words, pursuant to the terms of the 2009 Stock Option Plan, "fair market value" would become the dispositive metric by which to determine the value of NAM shares in the event that NAM did not go public by January 21, 2015.

76.     Upon information and belief, the intended meaning of "fair market value," as used in the Allotment Agreement, was the price at which a willing buyer and a willing seller, both unrelated with full knowledge of all relevant information, would enter into a transaction without undue pressure being applied to either.

77.     In addition, Article 12(3) of Allotment Agreement provided that, prior to the implementation of any IPO, Defendant NAM was required to calculate the purchase price of the units of SARs twice a year. The periods used for such calculations were to be "any one (1) month period during each of (i) the period from June 1 of any year to July 31 and (ii) the period from December 1 of any year to January 31 of the following year."

78.     The Allotment Agreement also imposed certain fiduciary obligations on Defendants, as administrators of the 2009 Stock Option Plan, including most importantly, that the Company use its "best efforts" in the administration and enforcement of the 2009 Stock Option Plan not to disadvantage plan participants, which included the Plaintiffs.  Defendant Shibata, as the de facto administrator of the 2009 Stock Option Plan acting on behalf of the Company in 2014 and 2015, therefore owed participants, including Plaintiffs, a fiduciary duty to use his best efforts not to disadvantage them.

79.     Defendants' fiduciary duties are expressly affirmed throughout the Allotment Agreement, which repeatedly obligates Defendants to use their "best efforts not to create any disadvantage[]s for the Grantee."

80.     For example, Article 18 of the Allotment Agreement requires Defendants to use "best efforts" not to disadvantage Plan participants when Defendants seek to amend the Allotment Agreement, as "the Company deems necessary at its reasonable judgment."

81.     Likewise, Article 19 of the Allotment Agreement requires Defendants to use "best efforts" not to disadvantage Plan participants when Defendants act "in order to set forth the details regarding enforcement of [the Allotment] Agreement."

82.     Likewise, Article 20 of the Allotment Agreement requires Defendants to use "best efforts" in the handling of matters not set forth in the Allotment Agreement and expressly requires that matters not set forth in the Allotment Agreement "be resolved in accordance with [] good faith principle[s] through consultation between the [Defendants] and the Grantee." Article 20 of the

Allotment Agreement permits Defendants to "make a reasonable decision" if "an agreement cannot be reached through consultation."

83.     The 2009 Stock Option Plan's Details of Stock Acquisition Rights to be issued (Terms and Conditions) (the "Terms and Conditions"), which also governed the administration of the 2009 Stock Option Plan, likewise imposed certain fiduciary duties on Defendants as plan administrators.  Specifically, Article 13 of the Terms and Conditions requires that Defendants use their "best efforts not to create any disadvantage[]s for the Grantee" when handling amendments and "other measures taken as to these terms and conditions."

### C.     Defendant NAM Awards Units of SARs to Plaintiffs

84.     In or about January 2010, NAM notified Plaintiff Alfandary that she would be allotted 19 units of the Company's SARs pursuant to the 2009 Stock Option Plan, and that 3,300 ordinary shares of NAM would be allotted to each such unit.  NAM, through its Human Resources Department, so notified Alfandary by sending a package of written materials from NAM's Tokyo offices to her at NAMA's New York, New York offices, where she worked.  Among those materials were items that she needed to fill out and complete in order to safeguard her rights with respect to the units of SARs she was allotted. Those materials included a Notification and Subscription Application for SARs, the Allotment Agreement, a Letter of Commitment, a Pledge Form, and the Receipt of Business Report ("Allotment Package").  NAM instructed that once Alfandary had filled out and completed the requisite forms, she was to return a copy of each of them to NAM's Human Resources Department in Tokyo by no later than February 8, 2010. In or about February 2010, Alfandary executed the Allotment Agreement, filled out and completed the

25

requisite forms in New York, New York, and timely sent them back, as instructed, to NAM's Human Resources Department in Tokyo.

85.     In or about August 2010, NAM notified Plaintiff Hansen that he would be allotted approximately 20 units of the Company's SARs pursuant to the 2009 Stock Option Plan, and that 3,300 ordinary shares of NAM would be allotted to each such unit.  NAM, through its Human Resources Department, so notified Hansen by sending him an Allotment Package (identical to that which was sent to Alfandary, with the exception that he received an Agreement on Allotment of Fiscal Year 2009 Second Series Stock Options ("Allotment Agreement Second Series") which was in all material respects identical to the initial, above-referenced Allotment Agreement) from NAM's Tokyo offices to him at NAMA's New York, New York offices, where he worked. Upon information and belief, NAM instructed that once Hansen had filled out and completed the requisite forms, he was to return a copy of each of them to NAM's Human Resources Department in Tokyo by no later than August 2010. Upon information and belief, in or about August 2010, Hansen executed the Allotment Agreement Second Series, filled out and completed the requisite forms in New York, New York, and timely sent them back, as instructed, to NAM's Human Resources Department in Tokyo.

86.     In or about January 2010, Defendant NAM notified Plaintiff Vicari that she would be allotted approximately units of the Company's SARs pursuant to the 2009 Stock Option Plan, and that 3,300 ordinary shares of NAM would be allotted to each such unit.  Upon information and belief, NAM, through its Human Resources Department, so notified Vicari by sending the Allotment Package to her at NAMA's New York, New York offices, where she worked. Upon

further information and belief, NAM instructed that once Vicari had filled out and completed the requisite forms, she was to return a copy of each of them to NAM's Human Resources Department in Tokyo by no later than February 2010.  Upon information and belief, in or about February 2010, Vicari executed the Allotment Agreement, filled out and completed the requisite forms in New York, New York, and timely sent them back, as instructed, to NAM's Human Resources Department in Tokyo.

87.     In or about February 2010, NAM notified Plaintiff McCarthy in Tokyo, Japan that he would be allotted 1,341 units of the Company's SARs pursuant to the 2009 Stock Option Plan, and that 3,300 ordinary shares of NAM would be allotted to each such unit.  Upon information and belief, NAM, through its Human Resources Department, so notified McCarthy by sending the Allotment Package to him at NAM's Tokyo, Japan offices, where he worked.  Upon further information and belief, NAM instructed that once McCarthy had filled out and completed the requisite forms, he was to return a copy of each of them to NAM's Human Resources Department in Tokyo by no later than February 2010.  Upon information and belief, in or about February 2010, McCarthy executed the Allotment Agreement, filled out and completed the requisite forms in Tokyo, Japan, and timely sent them back, as instructed, NAM's Human Resources Department in Tokyo.

88.     Upon information and belief, in or about February 2010, NAM notified Plaintiff Wilder that he would be allotted 1,341 units of the Company's SARs pursuant to the 2009 Stock Option Plan, and that 3,300 ordinary shares of NAM would be allotted to each such unit.  Upon information and belief, NAM, through its Human Resources Department, so notified Wilder by

sending the Allotment Package to him at NAM's Tokyo, Japan offices, where he worked.  Upon further information and belief, NAM instructed that once Wilder had filled out and completed the requisite forms, he was to return a copy of each of them to NAM's Human Resources Department in Tokyo by no later than February 2010.  Upon information and belief, in or about February 2010, Wilder executed the Allotment Agreement, filled out and completed the requisite forms in Tokyo, Japan, and timely sent them back, as instructed, to NAM's Human Resources Department in Tokyo.

89.     Upon information and belief, between January 2010 and July 2010, NAM notified 18 other NAMA employees in New York, New York that they would be allotted units of the Company's SARs pursuant to the 2009 Stock Option Plan, and that 3,300 ordinary shares of NAM would be allotted to each such unit.

90.     Upon information and belief, NAM, through its Human Resources Department, so notified those other NAMA employees by sending the Allotment Package from NAM's Tokyo offices to them at NAMA's New York, New York offices, where they worked.  Upon further information and belief, NAM instructed that the employees notified in January 2010 were to return a copy of each completed form to NAM's Human Resources Department in Tokyo by no later than February 2010, and the employees notified in July 2010 were to return copies of their completed forms by no later than August 2010.

91.     Upon information and belief, a number of those other NAMA employees in New York, New York filled out and completed the requisite forms in New York, New York and timely sent them back, as instructed, during 2010 to NAM's Human Resources Department in Tokyo.

28

92.     Upon information and belief, between early 2010 and July 2015, NAM instructed its Human Resources Department in Tokyo and certain employees in the Human Resources Department at NAMA's offices in New York, New York to field inquiries about the 2009 Stock Option Plan from those NAMA employees in New York holding units of SARs.

93.     Upon information and belief, such inquiries flowed with regularity from NAMA's offices in New York, New York to Tokyo, by email, telephone, and other means, and answers followed with some regularity back from Tokyo to New York, by email, telephone, and other means, during this period.

94.     Upon information and belief, between early 2010 and July 2015, NAM also caused a number of its senior executives, including, from in or about 2009 to in or about 2012, its then-Chief Executive Officer Timothy McCarthy and others, to travel to NAMA's offices in New York several times a year in order to, among other things, answer questions from and have discussions with NAMA employees in New York that were participants in the 2009 Stock Option Plan.

**D.     Early Efforts to Value Defendant NAM**

95.     Between July 2009, when SMTB purchased NAM at a price equivalent to approximately 123 billion yen, or 625 yen per share, for 100% of the Company's shares, and late 2014, several valuations of NAM were conducted that resulted in per share prices that were significantly higher than 625 yen per share, as would be expected based on the Company's financial success during that time period.

96.     For example, in or about mid-2011, SMTB worked with numerous investment banks, including UBS, in preparation for a possible public offering of shares in Defendant NAM.

As part of those discussions, Defendant NAM's investment bankers, including UBS, agreed that the minimum valuation for the Company would be approximately 750 yen per share.  Likewise in or about 2011, SMTB internally valued NAM at approximately 145 billion yen, and used that valuation to adopt another employee stock option plan, this time with an exercise price set at 737 yen per share.

97.     Thereafter, in or about early 2014, NAM's Human Resources Department advised employees participating in the 2009 Stock Option Plan, including several of the Plaintiffs, that the Company expected an IPO price of 737 yen per share and an anticipated realization on the SARs units of 900 yen per share.

### E.     Positive Economic Developments Between 2009 and 2015

98.     Upon information and belief, between in or about 2009, when SMTB purchased NAM, and in or about early 2015, numerous substantial positive developments took place in the global financial markets, including but not limited to: (i) the Tokyo stock market index nearly doubled in value, and related market multiples, such as Price to Earnings and EBITDA, all rose significantly for companies listed on the Tokyo Stock Exchange, such as SMTB; and (ii) the Yen/U.S. Dollar ("USD") exchange rate moved from approximately 90 yen/USD, down to below approximately 80 yen/USD, and then back up to approximately 120 yen/USD, making Japanese entities such as NAM increasingly attractive to foreign investors.  Indeed, between 2009 (when NAM was purchased) and 2015, SMTB's share price rose 63.75%, and between July 2014 and July 2015, the share price rose 20.89%.

99.     NAM in particular experienced significant success during the same time period. Among the various positive developments were:

- From 2004 to 2013, AUM, a core metric of the Company's business, increased approximately threefold;

- From 2005 to 2006 and 2007 (just before the start of the global financial crisis), fiscal year profits increased from break-even to close to 10 billion yen;

- From 2005 and to 2013, NAM consistently ranked near the top of net flows in the industry in Japan;

- NAM's ratings and rankings for customer service were among the best in the industry in Japan, according to a leading Japanese fund management publication;

- NAM's equity and cash and seed investment balances increased significantly, as can be seen in NAM's publicly available audited financial statements; and

- There was significant expansion of the Company's business across Asia, including acquisitions in China, Singapore, Malaysia, Australia, and New Zealand and the creation of a joint venture in India.

**F.     Defendant Shibata Arrives at Defendant NAM**

100.     In July 2013, Defendant Shibata joined NAM as Executive Chairman. He remained in that position until January 2014, at which point he became the Chief Executive Officer and President of NAM.  Prior to joining NAM, Shibata served as Chief Operating Officer of Nomura Holding Group, Japan's largest brokerage firm, from about 2008 to July 2012, at which point he resigned in the wake of a widely reported insider trading scandal.

31

101.    From the outset of his employment at NAM, Shibata made negative and disparaging comments about former management.  In a variety of settings, Shibata repeatedly stated that problems NAM was experiencing after his arrival were the product of the incompetence and misconduct of prior management, and stated that "prior management ruined the firm" and "prior management took advantage of the company."  Shibata's disparaging comments were directly at odds with the Company's demonstrated track record of success by every objective performance measure.

102.    Upon information and belief, Shibata repeatedly represented to members of senior management in 2014 and 2015 that he would ensure that prior management and existing stock option holders received very little, if anything, for options granted to them, and that he intended to prevent prior management from deriving any value whatsoever from existing employee stock option plans, including the 2009 Stock Option Plan.

103.    On information and belief, in or about 2014, Shibata instructed NAM's Human Resources Department to begin working with outside advisors, including Plutus, to devise a new employee stock option plan.

104.    Upon information and belief, since there were limited funds available for a new stock option plan because of the Company's existing plans, Shibata told senior management that he wanted to force all existing option holders to forfeit their earned options to free up money for his new plan.

105.    On information and belief, Shibata sought to create a new top-heavy employee stock option plan heavily weighted in his favor, with a one yen strike price and limited mandatory

vesting periods.  On information and belief, Shibata shared his wishes with Plutus, which strove to create a new employee stock option plan agreeable to Shibata.  On information and belief, Plutus subsequently created precisely the plan Shibata sought.

     **G.**    **The 2014 Duff & Phelps Valuation**

106.    In or about mid-2014, NAM retained Duff & Phelps, a leading independent valuation company that NAM had used numerous times before for valuation exercises.  The purpose of the 2014 retention was to value NAM and determine the strike price for the new stock option plan Shibata sought to implement.

107.    Upon information and belief, Duff & Phelps was provided with all data and materials that were necessary and appropriate to provide the valuation sought and proceeded to calculate the fair market value of NAM.  After conducting a balanced calculation based on all available information, Duff & Phelps determined that the fair market value of NAM was approximately 853 yen per share.

108.    Upon information and belief, Duff & Phelps issued its valuation report only in draft form, and a copy was circulated to, among others, members of NAM's Management Committee and senior management of its material subsidiaries.  Upon information and belief, Shibata deemed the valuation to be much too high and thus ordered that the report remain as a "preliminary draft" and not be further issued in any form.

     **H.**    **Defendants Take Steps to Distort the Outcome of the 2009 Stock Option Plan**

109.    The rest of 2014 and January 2015 passed without an IPO for NAM.  Since there had been no IPO, Article 12 of the Allotment Agreement governing the 2009 Stock Option Plan

required that "three independent external evaluators" calculate NAM's fair market value twice a year, with the first calculation NAM's fair market value to be completed during June or July 2015.

110.    Knowing that their ability to defraud the 2009 Stock Option Plan participants, including Plaintiffs, would depend on the fair market valuation, Defendants concocted and carried out a fraudulent plan and scheme to rig the valuation process to produce a false and misleadingly low value.

111.    Upon information and belief, Defendants carried out their fraudulent scheme by deliberately, intentionally, and knowingly:

- excluding 2009 Stock Option Plan participants from meaningfully participating in the Evaluator selection process to obviate the possibility of impartiality;

- manipulating the Evaluator selection process to select firms that Defendants could control and influence;

- drastically limiting the information provided to the Evaluators, including free cash balances and prior valuations, to help rig the Evaluators' calculations;

- requiring the Evaluators to use a diluted number of shares in their calculations, despite the facts that no dilution existed under U.S. and Japanese Generally Accepted Accounting Principles and dilution was never taken into consideration in any prior valuation exercise at the Company;

- fashioning an artificially low 2015 budget for NAM and providing it to the Evaluators as the only forward-looking information; and

34

- accelerating the timing of the valuation calculation to April 2015, instead of in June and July 2015 as the 2009 Stock Option Plan required, in order to materially limit the amount of 2015 actual performance data that was available to the Evaluators.

### i. **Defendants Exclude Option Holders from Evaluator Selection Process**

112.    Upon information and belief, in line with Shibata's repeated statements regarding his intention to prevent participants from deriving any value from the 2009 Stock Option Plan, Defendants directed that all current holders of units of SARs under the 2009 Stock Option Plan be forbidden from meaningfully participating in the process of selecting the criteria for, and selecting, the three Evaluators.  As a result, Defendants successfully blocked 2009 Stock Option Plan participants from having any input whatsoever in the Evaluator selection process, ensuring that the selection process would not be impartial.

### ii. **Defendants Manipulate the Evaluator Selection Process**

113.    As stated above, Defendants exercised the power to appoint the Evaluators and successfully prevented 2009 Stock Option Plan participants from participating in the selection process.  As a result, Defendants fully controlled the Evaluator selection process and were free to choose Evaluators that could be easily influenced or that did not otherwise meet the requirements mandated by the 2009 Stock Option Plan.

114.    More specifically, in order for the Evaluators to be deemed truly "independent external evaluators" as required by the 2009 Stock Option Plan, it was absolutely essential that each Evaluator actually be completely independent and external to Defendants, and otherwise properly qualified to perform the requisite valuation.

115.     Despite these clear requirements, Defendants ensured that all three selected Evaluators lacked the requisite qualifications.   Incredibly, despite the fact that Duff & Phelps had just several months earlier prepared a fair market value calculation of NAM at approximately 853 yen per share, and despite the firm's strong professional reputation and experience in performing such calculations, Defendants did not select Duff & Phelps as one of the three Evaluators.

116.     Indeed, throughout the Evaluator selection process, Defendants deliberately ignored established firms that specialized in carrying out fair market valuations and could do so for the Company with no other conflicts of interest that could impair independence.   Instead, Defendants focused on: (1) a little-known Japanese firm with wholly uncertain experience in performing fair market value calculations for asset management firms or companies with an international footprint the size of NAM's; (2) an investment bank with extremely close ties to NAM and SMTB, which typically utilized "fair value" standards involving public market prices for a public company's stock in performing valuations, rather than "fair market value" standards; and (3) one of the large public accounting firms on which Defendants knew they could apply pressure given existing business arrangements between NAM and that firm.

117.     First, Defendants strategically selected Plutus as one of the three Evaluators, despite the fact that Plutus was far from independent or qualified.   As stated above, in late 2014, NAM, under Shibata's direction, engaged Plutus to design new stock option plans with inappropriately low strike prices for the benefit of Shibata and his management team.   This existing business relationship rendered Plutus neither "independent" nor "external" to the Company.

36

118.    Nor does Plutus appear qualified to carry out the fair market value calculation. Upon information and belief, as of 2015, Plutus had no previous experience preparing fair market valuations for asset management companies nor little, if any, experience in preparing fair market valuations for privately-held companies in the financial industry, and certainly for any such companies with significant portions of their business outside Japan, such as was the case with Defendant NAM.

119.    Second, upon information and belief, Defendants selected UBS as the second Evaluator, despite the fact that UBS was SMTB and NAM's long-time investment banker and thus clearly not an "independent" evaluator.  Upon information and belief, UBS had been SMTB's investment bank of choice on nearly all capital raising efforts and mergers and acquisitions transactions over the prior ten years, including SMTB's acquisition of NAM.  Despite long-standing deep ties clearly indicating that UBS's history with SMTB and NAM precluded true independence, Defendants selected UBS as an Evaluator.

120.    Finally, upon information and belief, Defendants selected PricewaterhouseCoopers ("PWC") as the third Evaluator, despite PWC's obvious lack of independence.  In fact, PWC had served as NAM's auditor in the past, and at the time of the valuation was receiving significant fees from NAM for audit services rendered on NAM's publicly offered mutual funds, which were under risk of being moved to another firm.  PWC had been previously replaced as NAM's corporate auditor at the demand of SMTB and risked losing the mutual fund audit business as well.  Thus, Defendants knew that they had the requisite leverage to influence PWC throughout the valuation process, rendering them anything but independent as intended by the 2009 Stock Option Plan.

### iii.   Defendants Drastically Limit the Information Provided to the Evaluators

121.   Upon information and belief, in addition to selecting Evaluators that lacked the requisite independence required by the 2009 Stock Option Plan, Defendants also fraudulently schemed to constrain the scope of the Evaluators' engagement by failing to report required information to the Evaluators, and in some cases, by deliberately reporting inaccurate information to the Evaluators.

122.   Upon information and belief, the following are among the items that should have been provided to the Evaluators in order for them to perform accurate fair market value calculations for a privately-held asset management company such as NAM:

- Access to all knowledgeable management;

- Three to five year financial forecasts;

- Prior valuation data;

- Normalization adjustments to the Profit/Loss Statement of the Company and its subsidiaries and joint ventures;

- Significant assets owned by the Company and its subsidiaries and joint ventures, such as seed money;

- Estimated historical and current free cash balances;

- Data considered material, such as AUM, for asset management firms;

- Significant intangible assets; and

- Issued and outstanding shares.

38

123.    Absent such data and materials, a valuation expert could not conduct a proper and sound fair market value calculation for the Company.  Tellingly, Defendants failed to provide the Evaluators with numerous key pieces of required information, including among other things, prior valuations of NAM, complete information on its investments and information concerning its other assets.

124.    Upon information and belief, Defendants withheld or misstated, among other things, the following information from the Evaluators, knowing full well that the lack of accurate data would have an adverse effect on the Evaluators valuation:

(i)      Duff & Phelps' 853 yen per share valuation from 2014;

(ii)     prior valuations performed as to its Chinese joint venture, Rongtong Fund Management, as well as accurate information reflecting the true profitability of Rongtong Fund Management by reporting budget amounts materially different than actual results as reported in NAM's quarter ending June 30, 2015 Management Reports;

(iii)    information regarding a publicly disclosed transaction which took place in or about summer 2014 in which Affin Bank of Malaysia acquired Hwang DBS. Upon information and belief, as part of this transaction, Affin Bank was required under Malaysian law to make an offer to purchase NAM's minority stake in Hwang Fund Management.  Upon information and belief, Defendants deliberately failed to disclose to the Evaluators the existence of this offer and the value assigned to

NAM's minority stake in Hwang Fund Management as part of this legally required offer; and

(iv)    information regarding an intangible asset in the form of a Long Term Fund Management Contract with Suncorp in Australia and New Zealand, an intangible asset in the form of a substantial distribution relationship with DBS Bank in Singapore, and an intangible asset related to the vast network of distribution arrangements NAM had in place in Japan, Singapore, Malaysia, Australia and New Zealand. Upon information and belief, some of these intangible assets were required to be fair valued at least annually as part of NAM's audited accounts.

125.    Finally, upon information and belief, Defendants deliberately kept from the Evaluators the existence of provisions in the Terms and Conditions that governed how excess cash would be accounted for in a valuation.

126.    Specifically, Section 6 of the Terms and Conditions governing the 2009 Stock Option Plan expressly provides that only cash equal to 50% of each year's net income was allowed to be dividend in any one year.

127.    As a result, in accordance with Section 6 of the Terms and Conditions governing the 2009 Stock Option Plan, any excess taken out over and above the allowed amount required a yen for yen adjustment to be made to the 625 yen strike price, and excess cash was to be taken into consideration in any valuation of NAM.  Upon information and belief, as of March 2015, Defendant NAM's excess free cash and investment balances had increased significantly from the 25 billion yen to an estimated 45 billion yen.  By failing to provide the Evaluators with the Terms

and Conditions of the 2009 Stock Option Plan, Defendants ensured that the excess cash would not be factored into the valuation.

### iv. Defendants Require the Evaluators to Use a Diluted Number of Shares in their Calculations

128.    Upon information and belief, Defendants also provided the Evaluators with a diluted number of ordinary shares they were to use as the denominator in their per share fair market valuation.  Per NAM's publicly available, audited financial statements, there was no difference at the time of the valuation between issued and fully diluted shares in connection with the 2009 Stock Option Plan. More to the point, pursuant to Section 10 of the Terms and Conditions the 2009 Stock Option Plan, the SARs awarded to participants could only be freely converted into shares of Defendant NAM if an IPO occurred.

129.    Notwithstanding this, Defendants provided the Evaluators with an improperly inflated number of shares, in the form of nonexistent diluted shares, thereby driving down the per share valuation of each Evaluator.

### v. Defendants Submit an Artificially Low Budget

130.    On information and belief, Defendants also prevented the Evaluators from making a proper and sound fair market value calculation for NAM by providing limited and artificially low forward looking information, specifically, the 2015 budget.  On information and belief, in or about mid-March 2015, Shibata presented the 2015 budget to NAM's Board of Directors.

131.     On information and belief, prior to the presentation to the Board of Directors, SMTB expressed concerns around the low profitability reflected in the budget, which assumed a

material increase in cost with no corresponding revenue growth. Shibata also provided a normalization presentation, which explained that Shibata authorized significant investments in headcount and costs over the prior 12 months. These cost increases were not supported by offsetting increases in revenue in the 2015 budget.

132.    Despite this, NAM's Board of Directors approved the version of the 2015 budget as presented, which reflected these investment costs, with no corresponding revenue projection. Defendants provided this artificially low budget to the Evaluators, and refused to provide normalization data, despite knowing that the data was necessary for a fair market value calculation.

133.    Upon information and belief, as of the end of Defendant NAM's first quarter on June 30, 2015, Defendant NAM's net income, adjusted for one-time items, was running approximately 50% ahead of the Board approved budget. Upon further information and belief, Defendants NAM and Shibata deliberately kept this actual performance data out of the Evaluators' calculations, well aware of its significance to a fair market calculation.

### vi.    Evaluators are Forced to Perform Their Fair Market Valuation Early

134.    Finally, upon information and belief, in or about April 2015, Defendants caused the three Evaluators to perform their valuations for NAM earlier than permitted. Specifically, despite the fact that the Allotment Agreement clearly stated that the fair market calculation was to take place in June or July 2015, Defendants induced the Evaluators to perform their calculations several months earlier than permitted.

135.    Upon information and belief, the decision of Defendants to cause the three Evaluators to carry out their work prematurely was further to their fraudulent plan and scheme to

provide the Evaluators with incomplete, inaccurate, and misleading information, particularly as to NAM's actual performance during 2015, so that their valuations would be artificially low.

136.    Upon information and belief, until at least early 2015, NAM had published on its internal Human Resources website an estimated value and "expected share market closing price" of 900 yen per share based on issued shares.  Presumably, the Evaluators' fair market value calculation would at least resemble that number.  Ultimately, it did not.

137.    Indeed, despite the numerous positive developments that had taken place over the years leading up to the valuation in the global financial market, and at NAM in particular, the Evaluators' calculations resulted in a much lower value—a mere 617 yen per share, 8 yen per share below the price/valuation ascribed to SMTB's 2009 purchase of NAM and the strike price of the 2009 Stock Option Plan from 6 years prior.

## I.    Defendants Communicate Their Fraudulent Valuation to SARs Holders

138.    In or about July 2015, Defendants sent packages by Federal Express from NAM's Tokyo offices to those holding units of SARs under the 2009 Stock Option Plan, including Plaintiffs.  Within each of those packages, among other things, was a memorandum titled "Request for Buyback in Respect of the Stock Options of Nikko Asset Management," dated July 2015, signed by Shibata on NAM letterhead noting that "five years have passed since the issuance of the 2009 . . . stock option pla[n], but we have not yet completed our Initial Public Offering."  Shibata stated that "the Company has decided to grant an opportunity for you to request the Company to buy back all of the 2009  . . . stock options held by you."  As Defendants knew, the package also contained a Notice of Purchase of Stock Acquisition Rights, dated July 10, 2015 ("Notice of

Purchase"), to Holders of Fiscal Year 2009/2010 Stock Options that stated that Defendant NAM was granting them "an opportunity . . . to request the Company to purchase all of the Stock Acquisition Rights held by [them]."

139.    The Notice of Purchase set forth the purchase price for the units of SARs and the procedures to request such a purchase, as follows:

Particulars:

1.      Purchase Price: 3,300 yen per unit of the Stock Acquisition Rights

(i)      Amount equal to the average of the computational evaluation results as to the fair market value per share of the ordinary shares of the Company provided by three independent external evaluators appointed by the Company: 617 yen

(ii)      Exercise price of the Stock Acquisition Rights requested to be purchased: 625 yen

(iii)      Amount calculated by subtracting the amount stated in (ii) above from the amount stated in (i) above: -8 yen. (Provided that the amount to be used for the calculation shall be 1 yen per share, as such amount is a negative number, and the purchase price shall be 3,300 yen, which is obtained by multiplying said amount by the amount of shares to be granted upon exercise of each Stock Acquisition Right.)

2.      Number of the Stock Acquisition Rights for which you can make a request for purchase:

All of the Stock Acquisition Rights currently held by you

3.      Period for Request for Purchase: One (1) month from the receipt of this notice

4.      Purchase Date: August 21, 2015 (Friday)

140.    In other words, the Notice of Purchase informed option holders that based on the Evaluators' results, the "fair market value" for each unit of SARs was a mere 617 yen per share. Furthermore, the purchase price was to be calculated by subtracting the exercise price (625 yen) from the fair market value per share (617 yen).  Since this resulted in a negative value for the units of SARs (-8 yen), Defendants assigned a value of one yen per share to the units of SARs.  Thus, Defendants, through the Notice of Purchase, informed the affected employees, including Plaintiffs, that if requested, NAM would purchase all of their units of SARs for a generous one yen per share. In sum, despite repeatedly stating that the Notice of Purchase was "an opportunity" granted to options holders to have NAM buy back all of their SARs, it was clear that no such opportunity truly existed.

141.    Additionally, section 5 of the Notice of Purchase, titled "Stock Acquisition Rights Held by Retired Person," stated that "As set forth in 2.(10)(v)(b)(x) of the...Terms and Conditions...all of the Stock Acquisition Rights which are currently held by you shall become un-exercisable on and after the Purchase Date...and will be extinguished."  In other words, according Defendant Shibata on behalf of the Company, if an individual, who, like Plaintiffs, was no longer employed with the company prior to the offer, did not fill out and complete the required purchase forms and return them to NAM's Tokyo offices before August 21, 2015, his or her options would become non-exercisable and extinguished, and NAM would not purchase their units of SARs.  This statement was patently false and misleading.

142.    Defendants' affirmative representation that the 2009 Stock Option Plan authorized the Company to mandate that former employees have the Company repurchase all of the SARs

held by former employees or otherwise have them automatically deemed extinguished, even though the SARS purportedly had no value and even though the Company had not yet conducted an IPO, was false and misleading.

143.    Indeed, Section 7 of Terms and Conditions expressly stated that the period of exercisability for SARs held by grantees runs from "January 22, 2012 until January 21, 2020," a continuous right belonging to all participants in the plan, irrespective of their current employment status, and nothing in the 2009 Stock Option Plan allowed Defendants to unilaterally cause former employees, including Plaintiffs, to forfeit that basic right.

**J.    Plaintiffs Receive and Respond to the Four SARs Purchase Documents**

144.    On or about July 15, 2015, Plaintiff Alfandary, in Scarsdale, New York, received by Federal Express the aforementioned package containing the memorandum from Shibata, Notice of Purchase, and purchase forms (the "SARs Purchase Documents").

145.    In or about July 2015, Plaintiff Hansen received the SARs Purchase Documents in Summit, New Jersey via Federal Express from NAM's Tokyo offices.

146.    In or about July 2015, Plaintiff Vicari, received the SARs Purchase Documents in Parlin, New Jersey, via Federal Express from NAM's Tokyo offices.

147.    In or about July 2015, Plaintiff McCarthy received the SARs Purchase Documents in Hillsborough, California, via Federal Express from NAM's Tokyo offices.

148.    In or about July 2015, Plaintiff Wilder received the SARs Purchase Documents in Tokyo, Japan via Federal Express from NAM's Tokyo offices.

149.    Upon information and belief, in or about July 2015, Defendants also sent the SARs Purchase Documents by Federal Express from NAM's Tokyo offices to all of the approximately 18 other former and current employees holding units of SARs in NAMA's offices in New York, New York.  Upon information and belief, the documents were sent to the NAMA offices in New York, New York for collection there by affected employees.

150.    In or about August 2015, Plaintiff Hansen, in Summit, New Jersey, filled out, completed, and sent back to Tokyo the aforementioned Notice of Request for Purchase and Bank Account Information Form, in order to effect the forced sale and purchase of his approximately 20 units of SARs.  In September 2015, NAM wired $391.76 to Hansen's bank account with Bank of America in Summit, New Jersey as proceeds from the sale and purchase of those approximately 20 units of SARs.

151.    Plaintiff McCarthy did not fill out and return any of the forms.  On August 20, 2015, Plaintiff McCarthy sent an email to Defendants in Tokyo stating that while he intended to exercise his right to sell all of his options, he "cannot agree to JPY617 because I believe the price to be false and not a fair market value."  He further stated that "A real fair market value should be calculated."  McCarthy further reserved "all rights to protect my rights under the 2009 Stock Option Plan."

152.    Plaintiff Alfandary also did not fill out and complete the forms.  On August 21, 2015, Alfandary sent a letter by mail from Scarsdale, New York addressed to Shibata in Tokyo. Therein, Alfandary stated that she did "not feel comfortable agreeing to the 617 yen without full information regarding this valuation." She added that she "would exercise my right to sell all of

my options, but cannot agree to JPY 617 because I believe the price to be false and not a fair market value." Alfandary further reserved all rights "to protect my rights under the 2009 Stock Option Plan."

153.    In or about August 2015, Plaintiffs Vicari and Wilder, also declined to fill out any of the forms sent to them by Defendant with respect to the possible sale and purchase of their units of SARs, because they did not believe the stated sale price was fair.

**K.    The Effects of Defendants' Wrongdoing**

154.    Upon information and belief, had three truly independent external evaluators been provided with all materials and data necessary and appropriate to perform a sound and proper fair market value calculation of NAM, the average of their three fair market value calculations would have been substantially higher than 617 yen per share, and likely between approximately 863 and approximately 964 yen per share.

155.    Upon information and belief, Defendants were successful in carrying out their fraudulent plan and scheme to ensure that the three Evaluators produced inaccurate, misleading, and artificially low valuations, so that those holding units of SARs under the 2009 Stock Option Plan, including Plaintiffs, would realize as little as possible from the sale of, or the decision not to sell, those units back to NAM.

156.    Tellingly, in October 2015, Defendants extended another "one-time voluntary liquidity opportunity" to employee participants in the 2009 Stock Option Plan, presumably because the July 2015 "opportunity" did not garner the response from employee participants that Defendants had schemed for.  Incredibly, the October 2015 offer set the purchase price at 677 yen

48

per share, which constituted a premium of 52 yen per share—more than 50 times higher than the July 2015 offer made just three months earlier.

157.    The fact that Defendants extended a second offer to employee participants in the 2009 Stock Option Plan with drastically better terms just three months after the July 15 offer, evinces not only the fraudulent nature of Defendants July 2015 valuation scheme and the fraudulent forced liquidation of all SARs held by the Company's former employees, but also illustrates Defendants' breach of fiduciary duty and breach of the clear and unambiguous terms of the 2009 Stock Option Plan.

158.    Defendants' conduct egregiously disadvantaged former employees, including Plaintiffs.  It was dishonorable—indeed unconscionable—and utterly fell short of any standard of good faith and fair dealing.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Plaintiff Hansen Against Both Defendants For Securities Fraud under Section 10(b) of the SEA and Rule 10b-5 Promulgated Thereunder)

159.    Plaintiffs reallege each preceding allegation as if fully set forth herein.

160.    Hansen has standing to assert this cause of action against Defendants pursuant to Section 10(b) of the SEA and Rule 10b-5 promulgated thereunder in connection with the sale of his units of SARs under the 2009 Stock Option Plan back to NAM in or about August 2015.

161.    Defendants violated Section 10(b) of the SEA and Rule 10b-5 promulgated thereunder by using means and instrumentalities of interstate commerce and the mails to:

(a) employ devices, schemes, and artifices to defraud;

(b) make untrue statements of material fact or omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) engage in acts, practices, and courses of business that operated as a fraud or deceit upon Plaintiffs, in connection with the sale by Plaintiff Hansen of his units of SARs granted pursuant to the 2009 Stock Option Plan to Defendant NAM in or about August 2015.

162.    Defendants employed devices, schemes, and artifices to defraud by taking steps, unbeknownst to Hansen, to distort and rig the outcome of the 2009 Stock Option Plan for the purpose of minimizing the amounts those holding units of SARs would realize from the sale of those units back to NAM.

163.    Among the wrongful acts Defendants took were: (i) the deliberate exclusion of all holders of units of SARs under the 2009 Stock Option Plan from meaningful participation in the process of setting the criteria for selecting the three Evaluators; (ii) deliberate selections of Evaluators that lacked independence and were otherwise unqualified as required by the terms of the 2009 Stock Option Plan; (iii) deliberate limitation and in certain instances misrepresentation of data and materials provided to the three Evaluators, so that they could not carry out a fair and reasonable fair market value calculation; (iv) deliberate disclosure of a false and inflated number of diluted shares of NAM to be used by the Evaluators in their calculations; and (v) deliberate decision to have the three Evaluators carry out their fair market value calculations in or about April 2015, instead of in or about June and July 2015 as contractually required, so that there would be

50

less information available to the Evaluators about the actual 2015 performance of NAM than would otherwise be the case.

164.     Defendants did all of this to fraudulently cause the three Evaluators to come up with an inaccurate, misleading, and artificially low fair market value for NAM and an inaccurate, misleading, and artificially low price per share for NAM's shares in order to minimize the amounts holders of units of SARs under the 2009 Stock Option Plan would realize from selling those units back to NAM, in connection with the sale by Plaintiff Hansen of his units of SARs back to NAM in or about August 2015.

165.     Defendants, unbeknownst to Hansen, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, when, in or about July 2015, Defendants represented to those holding units of SARs under the 2009 Stock Option Plan in the aforementioned Notice of Purchase that the "[a]mount equal to the average of the computational evaluation results as to the fair market value per share of the ordinary shares of the Company provided by three independent external evaluators appointed by the Company" was "617 yen." The statement was untrue in that the fair market value per share of NAM was substantially higher than 617 yen, and that the three Evaluators selected by the Company were not truly "independent external evaluators."

166.     Defendants also intentionally omitted that the process by which the fair market value per share of NAM was calculated was distorted and rigged in order to come up with an inaccurate, misleading, and artificially low value per share for the purpose of minimizing the

amounts holders of units of SARs under the 2009 Stock Option Plan would realize from the sale of those units back to NAM, in connection with Hansen's sale of his units of SARs back to NAM in or about August 2015.

167.    Additionally, Defendants' affirmative representation that the 2009 Stock Option Plan authorized the Company to mandate that former employees must have the Company repurchase all of their SARs or otherwise have them automatically deemed extinguished and forfeited, even though the SARs purportedly had no value according to the Company, and even though the Company had not yet conducted an IPO, was false and misleading.  In fact, the 2009 Stock Option Plan allowed no such thing and set the period of exercisability for the SARs from "January 22, 2012 until January 21, 2020," an expressly granted continuous right belonging to all participants in the plan, irrespective of their current employment status.

168.    The aforementioned untrue statements of material fact and omissions of material fact by Defendants carried with them the substantial likelihood that the holder of the units of SARs under the 2009 Stock Option Plan would consider those statements or omissions regarding the fair market value of NAM being 617 yen per share as important in making decisions as to how to proceed with respect to selling, or deciding not to sell, those units back to NAM.

169.    With respect to scienter, Defendants, unbeknownst to Hansen, carried out the conduct described above with an intent to deceive, manipulate, and defraud Hansen into thinking that the true and correct fair market value calculation for NAM in or about July 2015 was 617 yen per share, when, in fact, that value was much higher. Defendants further knew about, were conscious of, and/or reckless about the false and fraudulent character of their activities, statements,

52

and omissions, as part of their fraudulent plan and scheme to distort and rig the outcome of the 2009 Stock Option Plan and minimize the amounts holders of units of SARs under that Plan could realize by selling those units back to NAM.

170.    With respect to the scienter of Shibata individually, he had both the motive and opportunity to engage in the fraudulent plan and scheme that damaged Hansen.  Having joined NAM in 2013, he often stated his disregard for prior management and intention to preclude them and other holders of units of SARs, such as Hansen, from realizing monetary benefits under the 2009 Stock Option Plan.  In addition, he quickly sought to design new long-term incentive stock option plans, with low strike prices and limited vesting periods, from which he and his new management team could benefit.

171.    As Chief Executive Officer and President of NAM, Shibata was uniquely positioned to carry out his fraudulent plan and scheme and convince his colleagues and underlings to assist him in that effort. Moreover, Shibata was well aware of, conscious of, and/or reckless about his own wrongdoing and indeed was the driving force and mastermind behind the fraudulent plan and scheme described above, including selecting inexperienced or biased Evaluators in order to produce artificially low valuations for NAM, which would disadvantage holders of units of SARs under the 2009 Stock Option Plan and ultimately personally benefit him and his management team.

172.    Finally, once the Evaluators had made their calculations and come up with the averaged figure of 617 yen per share, Shibata was well aware that presenting that calculation to the holders of units of SARs would result in little, if any, money being realized from the sales of

those units back to NAM.  In misrepresenting that the "fair market value" of NAM was 617 yen per share, Shibata was consciously seeing to it that the purpose of his fraudulent plan and scheme— to severely limit amounts realized from the sales of units of SARs bought back by NAM—would come to fruition.

173.    Hansen justifiably relied upon the false and fraudulent activities, statements, and omissions of Defendants, because he trusted Defendants NAM and Shibata to be, respectively, a reputable financial institution and an honest and upstanding senior corporate executive, and because Defendants did not suggest or indicate in any way to Plaintiffs that their activities, statements, or omissions were false and fraudulent in any respect.  Based on that reliance, Hansen decided to sell his units of SARs back to NAM in or about August 2015.

174.    The false and fraudulent activities, statements, and omissions of Defendants proximately caused the damage to Hansen. If Defendants had not carried out those fraudulent activities and made those false and fraudulent statements and omissions, Hansen would not have sold his units of SARs for the price offered by NAM, and Hansen would have realized substantially more than he actually did from the sale of his units of SARs to NAM for one yen a share in or about August 2015.

175.    Hansen was directly damaged as a result of the false and fraudulent activities, statements, and omissions of Defendants, in that he received substantially less money than he should have from selling his units of SARs back to NAM in or about August 2015.

176.    As a result of the foregoing, Hansen seeks to recover damages for Defendants' fraudulent activities, statements and omissions, all in an amount to be determined at trial but believed to be in excess of $75,000.

## SECOND CAUSE ACTION

**(Plaintiffs Alfandary, Vicari, McCarthy, and Wilder
Against Both Defendants for Securities Fraud
under Section l0(b) of the SEA and Rule l0b-5 Promulgated Thereunder)**

177.    Plaintiffs reallege each preceding allegation as if fully set forth herein.

178.    Plaintiffs Alfandary, Vicari, McCarthy, and Wilder have standing to assert this cause of action against Defendants pursuant to Section 10(b) of the SEA and Rule 10b-5 promulgated thereunder in connection with the forced sale or forced liquidation of their units of SARs granted to them pursuant to the 2009 Stock Option Plan, as required by the July 2015 letter and Notice of Purchase of Stock Acquisitions Rights enclosed therewith from Defendants, which mandated that Plaintiffs, as former employees, request NAM to buyback the SARs or else have their SARs be automatically deemed extinguished.

179.    Defendants violated Section 10(b) of the SEA and Rule 10b-5 promulgated thereunder by using means and instrumentalities of interstate commerce and the mails to:

(a)    employ devices, schemes, and artifices to defraud;

(b)    make untrue statements of material fact or omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c)      engage in acts, practices, and courses of business that operated as a fraud or deceit upon Plaintiffs, in connection with the forced liquidation of Plaintiffs Alfandary, Vicari, McCarthy, and Wilder's units of SARs pursuant to the July 2015 letter and the Notice of Purchase enclosed therein.

180.    Defendants employed devices, schemes, and artifices by taking steps, unbeknownst to Plaintiffs, to distort and rig the outcome of the 2009 Stock Option Plan for the purpose of minimizing the amounts those holding units of SARs would realize from the sale of those units back to NAM.  Among the wrongful act Defendants took were: (i) the deliberate exclusion of all holders of units of SARs under the 2009 Stock Option Plan from meaningful participation in the process of setting the criteria for selecting the three Evaluators; (ii) deliberate selections of Evaluators that lacked independence and were otherwise unqualified as required by the terms of the 2009 Stock Option Plan; (iii) deliberate limitation and in certain instances misrepresentation of data and materials provided to the three Evaluators, so that they could not carry out a fair and reasonable fair market value calculation; (iv) deliberate disclosure of a false and inflated number of diluted shares of NAM to be used by the Evaluators in their calculations; and (v) deliberate decision to have the three Evaluators carry out their fair market value calculations in or about April 2015, instead of in or about June and July 2015 as contractually required, so that there would be less information available to the Evaluators about the actual 2015 performance of NAM than would otherwise be the case.

181.    Defendants did all of this to fraudulently cause the three Evaluators to come up with an inaccurate, misleading, and artificially low fair market value for NAM and an inaccurate,

misleading, and artificially low price per share for NAM's shares in order to minimize the amounts holders of units of SARs under the 2009 Stock Option Plan would realize from selling those units back to NAM, in connection with the forced liquidation of Plaintiffs Alfandary, Vicari, McCarthy, and Wilder's units of SARs pursuant to the July 2015 letter and the Notice of Purchase enclosed therein.

182.    Defendants, unbeknownst to Plaintiffs, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, when, in or about July 2015, Defendants represented to those holding units of SARs under the 2009 Stock Option Plan in the aforementioned Notice of Purchase that the "[a]mount equal to the average of the computational evaluation results as to the fair market value per share of the ordinary shares of the Company provided by three independent external evaluators appointed by the Company" was "617 yen." The statement was untrue in that the fair market value per share of NAM was substantially higher than 617 yen, and that the three Evaluators selected by the Company were not truly "independent external evaluators."

183.    Defendants also intentionally omitted that the process by which the fair market value per share of NAM was calculated was distorted and rigged in order to come up with an inaccurate, misleading, and artificially low value per share for the purpose of minimizing the amounts holders of units of SARs under the 2009 Stock Option Plan would realize from the sale of those units back to NAM, in connection with the forced liquidation of Plaintiffs Alfandary,

Vicari, McCarthy, and Wilder's units of SARs pursuant to the July 2015 letter and the Notice of Purchase enclosed therein.

184.    Additionally, Defendants' affirmative representation that the 2009 Stock Option Plan authorized the Company to mandate that former employees must have the Company repurchase all of the SARs held by former employees or otherwise have them automatically deemed extinguished and forfeited, even though the SARs purportedly had no value according to the Company, and even though the Company had not yet conducted an IPO, was false and misleading.  In fact, the 2009 Stock Option Plan allowed no such thing and set the period of exercisability for the SARs from "January 22, 2012 until January 21, 2020," an expressly granted continuous right belonging to all participants in the plan, irrespective of their current employment status.

185.    The aforementioned untrue statements of material fact and omissions of material fact by Defendants carried with them the substantial likelihood that the holder of the units of SARs under the 2009 Stock Option Plan would consider those statements or omissions regarding the fair market value of NAM being 617 yen per share as important in making decisions as to how to proceed with respect to selling, or deciding not to sell, those units back to NAM.

186.    Defendants' forced liquidation pursuant to the July 2015 letter operated as a fraud and deceit upon Plaintiffs in violation of Section 10(b) of the Exchange Act since it had the effect of fundamentally transforming and manipulating the value of the units of SARs held by Plaintiffs under the 2009 Stock Option Plan such that they were worthless and thereby forcing the sale of these units of SARs whereby the only remedies held by the Plaintiffs were to liquidate the SARs

58

in exchange for the artificially low price pursuant to Defendants' fraudulent valuation, or otherwise be automatically completely divested of any interest in the Company.

187.    Defendants omitted material facts and misrepresented material facts in their dissemination of information, including the valuation and the July 2015 letter to Plaintiffs, which omissions and misrepresentations were provided by using means or instrumentalities of interstate commerce or of the mails in connection with NAM's forced liquidation of the units of SARs under the 2009 Stock Option Plan.  Specifically, Defendants knowingly and intentionally, or with severe recklessness, made the material omissions including omissions regarding the valuation of the Company with regards to the "fair market value" of the units of SARs, including omissions regarding the material provided to the Evaluators in determining the price per share for holders of the SARs under the 2009 Stock Option Plan.

188.    With respect to scienter, Defendants, unbeknownst to Alfandary, Vicari, McCarthy, and Wilder, carried out the conduct described above with an intent to deceive, manipulate, and defraud Plaintiffs into thinking that the true and correct fair market value calculation for NAM in or about July 2015 was 617 yen per share, when, in fact, that value was much higher.  Defendants further knew about, were conscious of, and/or reckless about the false and fraudulent character of their activities, statements, and omissions, as part of their fraudulent plan and scheme to distort and rig the outcome of the 2009 Stock Option Plan and minimize the amounts holders of units of SARs could realize by selling those units back to NAM.

189.    With respect to the scienter of Shibata individually, he had both the motive and opportunity to engage in the fraudulent plan and scheme that damaged Alfandary, Vicari,

McCarthy, and Wilder.  Having joined NAM in 2013, he often stated his disregard for prior management and intention to preclude them and other holders of units of SARs, such as Alfandary, Vicari, McCarthy, and Wilder, from realizing monetary benefits under the 2009 Stock Option Plan. In addition, he quickly sought to design new long-term incentive stock option plans, with low strike prices and limited vesting periods, from which he and his new management team could benefit.

190.    As Chief Executive Officer and President of NAM, Shibata was uniquely positioned to carry out his fraudulent plan and scheme and convince his colleagues and underlings to assist him in that effort.  Moreover, Shibata was well aware of, conscious of, and/or reckless about his own wrongdoing and indeed was the driving force and mastermind behind the fraudulent plan and scheme described above, including selecting inexperienced or biased Evaluators in order to produce artificially low valuations for NAM, which would disadvantage holders of units of SARs under the 2009 Stock Option Plan and ultimately personally benefit him and his management team.

191.    Finally, once the Evaluators had made their calculations and come up with the averaged figure of 617 yen per share, Shibata was well aware that presenting that calculation to the holders of units of SARs would result in little, if any, money being realized from the sales of those units back to NAM.  In misrepresenting that the "fair market value" of NAM was 617 yen per share, Shibata was consciously seeing to it that the purpose of his fraudulent plan and scheme— to severely limit amounts realized from the sales of units of SARs bought back by NAM—would come to fruition.

192.   Alfandary, Vicari, McCarthy, and Wilder justifiably relied upon the false and fraudulent activities, statements, and omissions of Defendants, because they trusted Defendants NAM and Shibata to be, respectively, a reputable financial institution and an honest and upstanding senior corporate executive, and because Defendants did not suggest or indicate in any way to Plaintiffs that their activities, statements, or omissions were false and fraudulent in any respect.

193.   The false and fraudulent activities, statements, and omissions of Defendants proximately caused the damage to Alfandary, Vicari, McCarthy, and Wilder.  If Defendants had not carried out those fraudulent activities and made those false and fraudulent statements and omissions, Plaintiffs would not have had their units of SARs devalued to such an extent that they were deemed basically worthless and extinguished. Had Defendants taken steps to present a true and accurate fair market value calculation for Defendant, well in excess of the 617 yen per share, Plaintiffs rightly would have realized substantially more than they actually did from the forced liquidation of their units of SARs in or about August 2015.

194.   Alfandary, Vicari, McCarthy, and Wilder were directly damaged as a result of the false and fraudulent activities, statements, and omissions of Defendants, in that they were forced to liquidate their units of SARs pursuant to the July 2015 letter and Notice of Purchase enclosed therein and received no compensation for their units of SARs.

195.   As a result of the foregoing, Alfandary, Vicari, McCarthy, and Wilder seek to recover damages for Defendants' fraudulent activities, statements and omissions, all in an amount to be determined at trial but believed to be in excess of $75,000.

## THIRD CAUSE OF ACTION

### (All Plaintiffs Against Defendants for Breach of Fiduciary Duty)

196.     Plaintiffs reallege each preceding allegation as if fully set forth herein.

197.     As fiduciaries with the power to direct the administration and interpretation of the 2009 Stock Option Plan, Defendants owed Plaintiffs a fiduciary duty to act in utmost good faith in connection with the 2009 Stock Option Plan and its participants and not to act for their own personal profit or gain.

198.     The Allotment Agreement and the Terms and Conditions governing the 2009 Stock Option Plan imposed obligations on Defendants, as plan fiduciaries, to participating employees. Specifically, Articles 18, 19, and 20 of the Allotment Agreement, and Article 13 of the Terms and Conditions, expressly obligate Defendants to use their "best efforts not to create any disadvantage[]s for the Grantee."

199.     Article 20 of the Allotment Agreement governing the 2009 Stock Option Plan also provides, in pertinent part, that matters not set forth in the Allotment Agreement "shall be resolved in accordance with the good faith principle."

200.     NAM owed Plaintiffs fiduciary duties by virtue of its position as grantor and administrator of the 2009 Stock Option Plan, the terms of which expressly required the Company to use its "best efforts" not to disadvantage plan participants, which included the Plaintiffs.

201.     Likewise, Shibata owed Plaintiffs fiduciary duties by virtue of his status as Chief Executive Officer and President of NAM and thus the de facto administrator of the 2009 Stock Option Plan on behalf of the Company.

202.     The duty owed to the Plaintiffs by the Defendants included the obligation to provide Plaintiffs and participants and beneficiaries of the 2009 Stock Option Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding the value of the units of SARs granted under the 2009 Stock Option Plan, such that Plaintiffs and participants could make informed decisions.

203.     Defendants breached their fiduciary duty by making or approving the materially false and misleading statements specified above and by failing to cure what they knew to be false and misleading statements.  Defendants also breached their fiduciary duties by offering to holders of units of SARs an opportunity to accept a fraudulently low price for their units of SARs, and by seeking to compel former employees holding SARS granted pursuant to the 2009 Stock Option Plan to enter into such transactions with the Company that Defendants knew or should have known were to the unfair detriment of the Plaintiffs and other former employees holding SARs granted pursuant to the 2009 Stock Option Plan.

204.     Shibata also breached his fiduciary duty by failing to provide complete and accurate information regarding NAM's true value and the fair market value of the units of SARs held by the Plaintiffs.  Shibata purposely and knowingly concealed information regarding NAM's value in order to pursue transactions in his own interest; namely the creation of new employee stock option plans heavily weighted towards him and containing an artificially low strike price.

205.     Defendants further violated the fiduciary duty owed to Plaintiffs by failing to avoid and resolve conflicts of interest that arose in the selection of Evaluators by selecting those whom they believed to be amenable to continuing and furthering the objective to fraudulently minimize

the value of the units of SARs held by the Plaintiffs.  Defendants failed to engage independent evaluators who could make independent judgments as to the value of NAM and the units of SARs held by the Plaintiffs.

206.    Defendants also violated their fiduciary duty to Plaintiffs by failing to use best efforts not to disadvantage the Plaintiffs, and by failing to resolve matters in good faith, as clearly required by the Allotment Agreement.  Indeed, several of the Plaintiffs sought to confer with Defendants regarding the valuation and Defendants steadfastly refused.

207.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, Plaintiffs were divested of the entire operative value of their units of SARs granted under the 2009 Stock Option Plan.  If Defendants had discharged their fiduciary duties to prudently manage their obligations with respect to the Plaintiffs, the losses suffered by the Plaintiffs would have been avoided.

208.    Defendants are liable to restore the losses suffered by the Plaintiffs caused by Defendants breaches of their fiduciary duties owed to the Plaintiffs as alleged herein.

209.    As a result of the foregoing, Plaintiffs seek to recover damages for Defendants' breach of the fiduciary duties in connection with the 2009 Stock Option Plan, all in an amount to be determined at trial but believed to be in excess of $75,000.

## FOURTH CAUSE OF ACTION

### (All Plaintiffs Against Both Defendants for Common Law Fraud)

210.    Plaintiffs reallege each preceding allegation as if fully set forth herein.

211.    Defendants, unbeknownst to Plaintiffs, carried out a fraudulent scheme by taking steps to distort and rig the outcome of the 2009 Stock Option Plan for the purpose of minimizing the amounts those holding units of SARs would realize from the sale of those units back to Defendant NAM.

212.    Among the wrongful act Defendants took were: (i) the deliberate exclusion of all holders of units of SARs under the 2009 Stock Option Plan from meaningful participation in the process of setting the criteria for selecting the three Evaluators; (ii) deliberate selections of Evaluators that lacked independence and were otherwise unqualified as required by the terms of the 2009 Stock Option Plan; (iii) deliberate limitation and in certain instances misrepresentation of data and materials provided to the three Evaluators, so that they could not carry out a fair and reasonable fair market value calculation; (iv) deliberate disclosure of a false and inflated number of diluted shares of NAM to be used by the Evaluators in their calculations; and (v) deliberate decision to have the three Evaluators carry out their fair market value calculations in or about April 2015, instead of in or about June and July 2015 as contractually required, so that there would be less information available to the Evaluators about the actual 2015 performance of NAM than would otherwise be the case.

213.    Defendants did all of this to fraudulently cause the three Evaluators to come up with an inaccurate, misleading, and artificially low fair market value for NAM and an inaccurate, misleading, and artificially low price per share for NAM's shares in order to minimize the amounts holders of units of SARs under the 2009 Stock Option Plan would realize from selling those units

back to NAM, in connection with the sale by Plaintiff Hansen of his units of SARs back to NAM in or about August 2015.

214.     Defendants, unbeknownst to Plaintiffs, made untrue statements of material fact and omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, when, in or about July 2015, Defendants represented to those holding units of SARs under the 2009 Stock Option Plan in the aforementioned Notice of Purchase that the "[a]mount equal to the average of the computational evaluation results as to the fair market value per share of the ordinary shares of the Company provided by three independent external evaluators appointed by the Company" was "617 yen." The statement was untrue in that the fair market value per share of NAM was substantially higher than 617 yen, and the Evaluators selected by the Company were not truly "independent external evaluators."

215.     Defendants also intentionally omitted that the process by which the fair market value per share of NAM was calculated was distorted and rigged in order to come up with an inaccurate, misleading, and artificially low value per share for the purpose of minimizing the amounts holders of units of SARs under the 2009 Stock Option Plan would realize from the sale of those units back to NAM, in connection with Hansen's sale of his units of SARs back to NAM in or about August 2015.

216.     Additionally, Defendants' affirmative representation that the 2009 Stock Option Plan authorized the Company to mandate that former employees must have the Company repurchase all of the SARs held by former employees or otherwise have them automatically

66

deemed extinguished and forfeited, even though the SARs purportedly had no value according to the Company, and even though the Company had not yet conducted an IPO, was false and misleading.   In fact, the 2009 Stock Option allowed no such thing and set the period of exercisability for the SARs from "January 22, 2012 until January 21, 2020," an expressly granted continuous right belonging to all participants in the plan, irrespective of their current employment status.

217.    The aforementioned untrue statements of material fact and omissions of material fact by Defendants carried with them the substantial likelihood that the holders of units of SARs under the 2009 Stock Option Plan, such as Plaintiffs, would consider those statements or omissions of material fact regarding the fair market value of NAM being 617 yen per share, and regarding the three Evaluators being "independent external evaluators," as important in making decisions as to how to proceed with respect to selling, or deciding not to sell, those units back to NAM.

218.    Defendants, unbeknownst to Plaintiffs, carried out the conduct described above with an intent to deceive, manipulate, and defraud Plaintiffs into believing, and relying upon the fact, that the true and correct fair market value calculation for NAM in July 2015 was 617 yen per share, when, in fact, that value was much higher.

219.    Defendants knew about, and also had a reckless disregard for, the false and fraudulent character of their activities, statements, and omissions, all as part of their fraudulent plan and scheme to distort and rig the outcome of the 2009 Stock Option Plan by minimizing the amounts holders of units of SARs could receive by selling, or deciding not to sell, those units back to NAM.

220.     Plaintiffs relied upon the false and fraudulent activities, statements, and omissions of Defendants in deciding to sell, or not to sell, their units of SARs back to NAM in or about August 2015.  In addition, Plaintiffs were justified in relying upon Defendants' false and fraudulent activities, statements, and omissions, because Plaintiffs trusted Defendants to be, respectively, a reputable financial institution and an honest and upstanding senior corporate executive, and because Defendants did not suggest or indicate in any way to Plaintiffs that their activities, statements, or omissions were false and fraudulent in any respect.

221.     Further, Plaintiffs were damaged, because they relied and had no choice but to rely upon the false and fraudulent activities, statements, and omissions of Defendants in believing that Defendants were presenting a true and accurate fair market value calculation at 617 yen per share, when that calculation was inaccurate, misleading, and artificially low and should have been considerably higher.  Had Defendants presented a true and accurate fair market value calculation of NAM, all Plaintiffs would have received substantially more than they did from selling, or deciding not to sell, those units back to NAM in or about August 2015.

222.     The false and fraudulent activities, statements, and omissions of Defendants proximately caused damage to Plaintiffs.  Had Defendants not carried out those false and fraudulent activities and made those false and fraudulent statements and omissions, Plaintiff Hansen would not have sold his units of SARs for the price actually paid by Defendant NAM (one yen per share), and Plaintiffs Alfandary, Vicari, McCarthy, and Wilder would not have declined to sell their units of SARs and received nothing at all from Defendant NAM for those units. Had Defendants taken steps to present a true and accurate fair market value calculation for NAM well

in excess of 617 yen per share, all Plaintiffs would rightly have realized substantially more than they actually did from their sale, or decision not to sell, their units of SARs under the 2009 Stock Option Plan back to NAM in or about August 2015.

223.    Plaintiffs were actually damaged because of the false and fraudulent activities, statements, and omissions of Defendants, in that Plaintiffs received substantially less than they should have from selling, or deciding not to sell, their units of SARs under the 2009 Stock Option Plan back to NAM in or about August 2015.

224.    The false and fraudulent activities, statements, and omissions of Defendants were wanton and malicious and of great moral culpability, and those false and fraudulent activities, statements, and omissions bordered on the criminal.

225.    As a result of the foregoing, Plaintiffs seek to recover damages for Defendants' fraudulent activities, all in an amount to be determined at trial but believed to be in excess of $75,000.

## FIFTH CAUSE OF ACTION

### (All Plaintiffs Against Defendant NAM for Breach of Contract)

226.    Plaintiffs reallege each preceding allegation as if fully set forth herein.

227.    In or about January 2010, NAM and each of Plaintiffs Alfandary, Vicari, McCarthy, and Wilder separately entered into the Allotment Agreement, which was a valid and binding contract between the parties.

228.    In or about August 2010, NAM and Hansen entered into the Allotment Agreement Second Series (identical to the above-referenced Allotment Agreement), which was a valid and binding contract between the two parties.

229.    Under Article 12 of the Allotment Agreement, in the event Defendant NAM had not implemented an IPO on or before January 21, 2015, those allotted units of SARs, including Plaintiffs, were entitled to request that Defendant NAM purchase their units of SARs, and Defendant NAM was thereupon required to purchase them, if so requested.  NAM did not implement an IPO on or before January 21, 2015.

230.    Article 12(2) of the Allotment Agreement provided, in pertinent part, that the purchase price for such units would be calculated "by multiplying (i)(a) the amount equal to the average of the computational evaluation results as to the fair market value per share of the ordinary shares of [NAM] obtained from three independent external evaluators appointed by [NAM] less (b) the amount equivalent to the Exercise Price for the [SARs] to be purchased by (ii) the number of shares for Grant with respect to such SARs on the date of the purchase thereof."

231.    Given the foregoing, the Allotment Agreement plainly implied that the three Evaluators appointed by NAM to calculate "fair market value" would be truly independent of the company, fully external to the company, and in fact wholly qualified to perform a sound, proper, and legitimate fair market valuation, armed with all data and materials necessary and appropriate to carry out a sound, proper, and legitimate fair market valuation (the "Implied Terms").

232.    In addition, Article 12(3) of the Allotment Agreement provided that, prior to the implementation of any IPO, Defendant NAM was required to calculate the purchase price of the

units of SARs twice a year.  The periods used for such calculations were to be "any one (1) month" during each of the periods from (i) June 1 to January 31 of any year and (ii) December 1 to January 31 of the following year.  In other words, one calculation was to be carried out either during June and July and the other calculation was to be carried out either during December or the following January.

233.    By deliberately and knowingly selecting UBS as one of the three Evaluators, NAM breached Article 12(2) of the Allotment Agreement, because UBS was not truly "independent" of NAM.

234.    By deliberately and knowingly selecting PWC as one of the three Evaluators, NAM breached Article 12(2) of the Allotment Agreement, because PWC was not truly "independent" of NAM.

235.    NAM's breach of Article 12(2) of the Allotment Agreement, as described in the preceding paragraph, was a material breach of that Agreement.

236.    By deliberately and knowingly selecting Plutus as one of the three Evaluators, NAM breached Article 12(2) of the Allotment Agreement, because Plutus was not truly "independent" of NAM and nor was it actually qualified as required by the Implied Terms.

237.    NAM's breach of Article 12(2) and the Implied Terms, as described herein, was a material breach of the Allotment Agreement.

238.    By causing the three Evaluators to carry out their calculations of fair market value in or about April 2015, instead of in or about June and July 2015, NAM breached Article 12(3) of the Allotment Agreement.

71

239.    NAM's breach of Article 12(3) of the Allotment Agreement, as described in the preceding paragraph, was a material breach of that agreement.

240.    By drastically limiting the amount of data and materials available and provided to the Evaluators for the purpose of causing them to come up with inaccurate, misleading, and artificially low fair market value calculations for NAM, NAM breached the Implied Terms of the Allotment Agreement.

241.    NAM's breach of the Implied Terms of the Allotment Agreement, as described in the preceding paragraph, was a material breach of that agreement.

242.    Additionally, under Articles 18, 19 and 20 of the Allotment Agreement, NAM was required to use its "best efforts" to not create any disadvantage for the Plaintiffs as grantees of the SARs.

243.    Article 20 of the Allotment Agreement also provided, in pertinent part, that matters not set forth in the agreement "shall be resolved in accordance with the good faith principle."

244.    It was an implied term of the Allotment Agreement that all employees participating in the 2009 Stock Option Plan would be treated equally by NAM and not disadvantaged with respect to their status as existing, new or former employees.

245.    NAM knowingly and deliberately breached Articles 18, 19, and 20 of the Allotment Agreement by failing to use best efforts not to disadvantage Plaintiffs with respect to the Notice of Purchase, which disadvantaged Plaintiffs, as former employees, by forcing them to liquidate their SARs at the inaccurate, misleading, and artificially low fair market value price or else have their SARs automatically extinguished.

246.     Defendant NAM's breaches of Articles 18, 19, and 20 of the Allotment Agreement, as described in the preceding paragraph, was a material breach of the agreement.

247.     NAM knowingly and deliberately breached Article 20 of the Allotment Agreement by failing to act in good faith in the handling of matters with the Plaintiffs.

248.     NAM's breach of Article 20 of the Allotment Agreement, as described in the preceding paragraph, was a material breach of the agreement.

249.     Section 7 of the Allotment Agreement's Terms and Conditions expressly granted the continuous right to all participants in the 2009 Stock Option Plan, irrespective of current employment status, to exercise their SARs during the period of exercisability running from "January 22, 2012 until January 21, 2020," and nothing in the 2009 Stock Option Plan allowed Defendants to unilaterally cause former employees, including Plaintiffs, to forfeit that basic right.

250.     By mandating in July 2015, that former employees, including Plaintiffs, must have the Company repurchase all of the SARs held by them or otherwise have them automatically deemed extinguished and forfeited, despite being nowhere near the end of the period for exercisability as set forth above, NAM breached Section 7 of the Terms and Conditions.

251.     Section 10(iii) of the Terms and Conditions which explicitly states that NAM "must have implemented the IPO at the time of the exercise of any of the Stock Acquisition Rights," only permits the Company to offer a mandatory opportunity to repurchase the SARs held by former employees, including Plaintiffs, during the three month period following the implementation of an IPO.

252.    By mandating in July 2015, that former employees, including Plaintiffs, must have the Company repurchase all of the SARs held by them or otherwise have them automatically deemed extinguished and forfeited, despite the fact that no IPO had taken place, Defendant NAM breached Section 10 of the Terms and Conditions.

253.    Plaintiffs suffered monetary damages as a result of NAM's various material breaches of the Allotment Agreement and the Terms and Conditions, in that Plaintiffs did not receive anything near what they should have from the sale (in Hansen's case) or forced liquidation of their SARs.

254.    NAM's various breaches of the Allotment Agreement and Terms and Conditions, alone and together, caused the monetary damages suffered by the Plaintiffs.

255.    As a result of the foregoing, Plaintiffs seek to recover damages for NAM's breaches of the Allotment Agreement and Terms and Conditions, all in an amount to be determined at trial but believed to be in excess of $75,000.

## SIXTH CAUSE OF ACTION

### (All Plaintiffs Against Defendant Shibata For Intentional Interference with Contractual Relations)

256.    Plaintiffs reallege each preceding allegation as if fully set forth herein.

257.    The Allotment Agreement was a valid and binding contract between Plaintiff Alfandary and NAM.

258.    The Allotment Agreement Second Series was a valid and binding contract between Plaintiff Hansen and NAM.

259.    The Allotment Agreement was a valid and binding contract between Plaintiff Vicari and NAM.

260.    The Allotment Agreement was a valid and binding contract between Plaintiff McCarthy and NAM.

261.    The Allotment Agreement was a valid and binding contract between Plaintiff Wilder and NAM.

262.    From in or about July 2013 to in or about August 2015, Defendant Shibata was fully aware of each of the aforementioned agreements between NAM and the Plaintiffs.

263.    As described above, Shibata committed common law fraud against all Plaintiffs. Shibata's actions, statements, and omissions in carrying out that fraud against all Plaintiffs were intentional.

264.    The aforementioned common law fraud of Shibata caused NAM to breach the aforementioned agreements.  Shibata caused those breaches by, among other things, (i) selecting Plutus as one of the Evaluators, when it was not truly independent of NAM and was not wholly qualified to act in that capacity; (ii) selecting UBS as one of the Evaluators, when it was not truly independent of Defendant NAM; (iii) selecting PWC when it was not truly independent of Defendant NAM; (iv) drastically limiting the data and materials available and provided to the Evaluators; (v) causing the three Evaluators selected to come up with an artificially low, misleading, and inaccurate "fair market value" for NAM in or about April 2015; and (vi) causing the Evaluators to perform their fair market value calculations in or about April 2015, instead of in or about June and July 2015.

265.    The aforementioned common law fraud of Shibata caused all Plaintiffs substantial damage, in that Plaintiffs did not receive as much as they should have from their sales of, or their decisions not to sell, their units of SARs back to NAM in or about August 2015.

266.    The tortious and intentional interference of Shibata with the aforementioned agreements was wanton and malicious and of great moral culpability, and that tortious and intentional interference bordered on the criminal.

267.    As a result of the foregoing, Plaintiffs seek to recover damages for Shibata's tortious actions, all in an amount to be determined at trial but believed to be in excess of $75,000

## SEVENTH CAUSE OF ACTION

**(All Plaintiffs Against Both Defendants for Breach of the
Implied Covenant of Good Faith and Fair Dealing)**

268.    Plaintiffs reallege each preceding allegation as if fully set forth herein.

269.    The Allotment Agreement was a valid and binding contract between Plaintiff Alfandary and Defendant NAM and imposed upon the parties a duty of good faith and fair dealing in its performance and enforcement.

270.    The Allotment Agreement Second Series was a valid and binding contract between Plaintiff Hansen and Defendant NAM and imposed upon the parties a duty of good faith and fair dealing in its performance and enforcement.

271.    The Allotment Agreement was a valid and binding contract between Plaintiff Vicari and Defendant NAM and imposed upon the parties a duty of good faith and fair dealing in its performance and enforcement.

272.    The Allotment Agreement was a valid and binding contract between Plaintiff McCarthy and Defendant NAM and imposed upon the parties a duty of good faith and fair dealing in its performance and enforcement.

273.    The Allotment Agreement was a valid and binding contract between Plaintiff Wilder and Defendant NAM and imposed upon the parties a duty of good faith and fair dealing in its performance and enforcement.

274.    Defendants NAM and Shibata violated the implied covenant of good faith and fair dealing by depriving Plaintiffs of the benefit of exercising rights in connection with their units of SARs under the 2009 Stock Option Plan.

275.    Defendants NAM and Shibata further violated the implied covenant of good faith and fair dealing by depriving Plaintiffs of independent and impartial Evaluators in order to determine the fair market value of their units of SARs.

276.    Defendants NAM and Shibata further violated the implied covenant of good faith and fair dealing by providing a fraudulent and unreasonable offer to the Plaintiffs for their units of SARs under the forced liquidation pursuant to the July 2015 letter and disguising this forced sale as a fair "opportunity" to request the buyback of the options.

277.    Defendants NAM and Shibata interfered with the common purpose of the Allotment Agreements and the expectation of Plaintiffs to receive compensation for their employment and the fair market value for their units of SARs under the 2009 Stock Option Plan. In frustrating the expectation of the parties, Defendants deferred the common purpose of the 2009

Stock Option Plan to their own self-interest in minimizing the value of the units of SARs held by the Plaintiffs.

278.    Plaintiffs reasonably expected to receive fair market value for their units of SARs and to receive impartial and independent evaluations beginning in June or July of 2015 and continuing twice a year until Plaintiffs exercised their rights under the Allotment Agreements.

279.    The conduct of Defendants NAM and Shibata injured the rights of the Plaintiffs to receive the benefits under the 2009 Stock Option Plan in that they were forced to liquidate their shares at the artificially low price or have their share extinguished all together.

280.    Defendants caused economic loss to Plaintiffs and deprived Plaintiffs of the benefits they would have received had the Defendants acted in good faith pursuant to the 2009 Stock Option Plan and the Allotment Agreement.

281.    As a result of the foregoing, Plaintiffs seek to recover damages from Defendants for their breach of the covenant of good faith and fair dealing, all in an amount to be determined at trial but believed to be in excess of $75,000.

## EIGHTH CAUSE OF ACTION

### (All Plaintiffs Against Both Defendants for Unjust Enrichment)

282.    Plaintiffs reallege each preceding allegation as if fully set forth herein.

283.    Plaintiffs conferred a benefit upon the Defendants by selling their units of SARs back to NAM at artificially and fraudulently manipulated prices or by suffering the extinguishment of their units of SARs whereby such Plaintiffs received nothing. The manipulated fair market price and reduction of the Plaintiffs' rights under the Allotment Agreement went to the benefit of

Defendants who subsequently created another employee stock option plan with far favorable terms to the benefit of NAM, existing employees of NAM, and Shibata who was granted options under the new, more favorable plan.

284.    Defendants, by virtue of their wrongful conduct described throughout this Complaint, acknowledged and accepted the benefit conferred by Plaintiffs.

285.    It would be inequitable or unconscionable to permit the Defendants to retain the benefit conferred on them by Plaintiffs.

286.    As a result of the foregoing, Plaintiffs seek to recover damages for Defendants' unjust enrichment in an amount to be determined at trial but believed to be in excess of $75,000.

## JURY DEMAND

287.    Plaintiffs hereby demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs Christina Alfandary, Jeffrey Hansen, Laurie Vicari, Timothy McCarthy, and Bill Wilder respectfully pray that this Court enter Judgment against Defendants, as follows:

a.    On the First Cause of Action, Judgment for Plaintiff Hansen against both Defendants for compensatory damages in an amount to be determined at trial, plus interest;

b.    On the Second Cause of Action, Judgment for Plaintiffs Alfandary, Vicari, McCarthy, and Wilder against both Defendants for compensatory damages in an amount to be determined at trial, plus interest;

79

c.      On the Third Cause of Action, Judgment for all Plaintiffs against both Defendants for compensatory and punitive damages in amounts to be determined at trial, plus interest;

d.      On the Fourth Cause of Action, Judgment for all Plaintiffs against both Defendants for compensatory and punitive damages in amounts to be determined at trial, plus interest;

e.      On the Fifth Cause of Action, Judgment for all Plaintiffs against Defendant NAM for compensatory damages in an amount to be determined at trial, plus interest;

f.      On the Sixth Cause of Action, Judgment for all Plaintiffs against Defendant Shibata for compensatory and punitive damages in amounts to be determined at trial, plus interest;

g.      On the Seventh Cause of Action, Judgment for all Plaintiffs against both Defendant for compensatory and punitive damages in amounts to be determined at trial, plus interest;

h.      On the Eighth Cause of Action, Judgment for all Plaintiffs against both Defendant for compensatory and punitive damages in amounts to be determined at trial, plus interest; and

i.      On all Causes of Action, Judgment for all Plaintiffs against both Defendants for attorneys' fees, costs, and such further relief as the Court may deem just and proper.

Dated: New York, New York
      July 7, 2017

                        Respectfully Submitted,

                        CROSBY & HIGGINS LLP

                        /s/ Todd Higgins
                        _____

                        Todd A. Higgins, Esq. (TH7920)
                        477 Madison Ave., 6th Floor
                        New York, NY 10022
                        Ph: (646) 452-2300
                        Fx: (646) 452-2301
                        *Attorneys for Plaintiffs*