UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X

CHRISTINA ALFANDARY, JEFFREY
HANSEN, LAURIE VICARI, TIMOTHY
MCCARTHY, BILL WILDER, FREDERICK
REIDENBACH, and GREGORY ATKINSON,

        Plaintiffs,

   -against-

NIKKO ASSET MANAGEMENT CO., LTD.
TAKUMI SHIBATA, SUMITOMO MITSUI
TRUST BANK, LIMITED, and SUMITOMO
MITSUI TRUST HOLDINGS, INC.,

        Defendants.

---------------------------------------X

17 Civ. 5137 (RWS)
OPINION



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/4/18

A P P E A R A N C E S:

    Attorneys for Plaintiffs

    KASOWITZ, BENSON, TORRES LLP
    1633 Broadway
    New York, NY 10019
    By:  Daniel J. Fetterman, Esq.
          David J. Mark, Esq.

    CROSBY & HIGGINS LLP
    140 Broadway, 46th Floor
    New York, NY 10005
    By:  Todd A. Higgins, Esq.

    Attorneys for Defendants

    SHEARMAN & STERLING LLP
    599 Lexington Avenue
    New York, NY 10022
    By:  Adam S. Hakki, Esq.
          John Gueli, Esq.
          Elizabeth J. Stewart, Esq.
          H. Miriam Farber, Esq.

**Sweet, D.J.**

Defendants Nikko Asset Management Co., Ltd. ("Nikko" or the "Company"), Takumi Shibata ("Shibata"), Sumitomo Mitsui Trust Bank, Limited ("SMTB"), and Sumitomo Mitsui Trust Holdings, Inc. ("SMTH") (collectively, the "Defendants") have moved on grounds of *forum non conveniens* and lack of personal jurisdiction to dismiss the First Amended Complaint ("FAC") of plaintiffs Christina Alfandary ("Alfandary"), Jeffrey Hansen ("Hansen"), Laurie Vicari ("Vicari"), Timothy McCarthy ("McCarthy"), Bill Wilder ("Wilder"), Frederick Reidenbach ("Reidenbach"), and Gregory Atkinson ("Atkinson") (collectively, the "Plaintiffs") seeking to enforce certain stock acquisition rights ("SARs"). Upon the conclusions set forth below, the motion is denied.

## I.    **Prior Proceedings**

On July 7, 2017, the Plaintiffs filed their Complaint. On September 20, 2017 filed their First Amended Complaint ("FAC") of 81 pages alleging the Defendants' fraudulent scheme, FAC ¶¶ 77-156, and ten causes of action: (1) violations of Section 10(b) and Rule 10(b)(5) by Hansen, *id.* ¶¶ 157-71; (2) by all Plaintiffs, *id.* ¶¶ 172-85; (3) violations by Shibata of

1

Section 20 of the Securities and Exchange Act ("SEA"), *id.* ¶¶ 186-89; (4&5) violations by SMTB and SMTH of Section 20 of the SEA, *id.* ¶¶ 190-95; (6) common law fraud *id.* ¶¶ 212-16; (7) conspiracy to commit common law fraud, *id.* ¶¶ 217-24; (8) breach of contract, *id.* ¶ 225; (9) breach of contract against Nikko, *id.* ¶¶ 263-65; and (10) for declaratory judgment, *id.* ¶¶ 266-70.

The instant motion was heard and marked fully submitted on April 11, 2018.

## II.  **The Facts**

The parties submitted substantial affidavits with exhibits in support of and in opposition to the pending motion from which the following account of relationships and events is drawn, *see Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 389-90 (S.D.N.Y. 2010) (courts may consider the pleadings, affidavits, and exhibits in deciding a motion to dismiss on *forum non conveniens* grounds).

The dispute between these sophisticated, well-advised parties concerns a series of complicated interrelated intra-corporate transactions.

2

During the relevant time period, Plaintiffs Alfandary, Vicari, and Hansen (collectively, the "NAMA Plaintiffs") were all senior executives of Nikko Asset Management of America, Inc. ("NAMA") in New York, a wholly owned subsidiary of Nikko. FAC ¶¶ 10-12, 20. Specifically, Alfandary was United States Business Head of NAMA, Hansen was NAMA's Senior Fund Manager and Managing, and Vicari was NAMA's Chief Compliance Officer. *Id.* ¶¶ 10-12. Plaintiffs McCarthy, Reidenbach, Wilder, and Atkinson were senior executives of Nikko. *Id.* ¶¶ 13-16. Specifically, McCarthy was Nikko's Chairman and Chief Executive Officer, Reidenbach was Nikko's Chief Financial Officer and Chief Operating Officer, Wilder was Nikko's President, and Atkinson was Nikko's Head of Global Trading. *Id.*

Defendants are Japanese nationals that maintain extensive contacts with the United States through an elaborate corporate structure.

Nikko, a privately-held investment advisor and asset manager, is incorporated in Japan and has its principal offices in Tokyo. *Id.* ¶ 17. Nikko has $165 billion under management, and is registered with the Securities and Exchange Commission ("SEC"), though it has no securities listed on any United States exchange. *Id.*; Sayato Decl. ¶ 4. Nikko files periodic and

3

continuous Form 13F reports with the SEC, as is required for "institutional investment managers that use the U.S. mails and exercise investment discretion over $100 million," as well as Form PF reports, which "must be filed by SEC-registered investment advisors that, with their related persons, have at least $150 million in private fund assets under management." Sayato Decl. ¶ 4.

Defendant SMTB is an institutional investment manager that owns 91.6% of Nikko. FAC ¶ 18. As part of that ownership, SMTB oversees and controls Nikko's business operations, and consolidates the Company's financial results with its own. *Id.* ¶¶ 17-18. SMTB filed Form 13F-NT with the SEC under Central Index Key Number 0001046017. *Id.*

Defendant SMTH is a publicly traded company that owns 100% of the shares of SMTB, and its ADRs are traded in the United States. *Id.* ¶ 19. The majority of SMTH's officers are also officers or executives of SMTB. *Id.*

Defendant Shibata was educated in the United States and is a Japanese citizen and resident. Shibata Decl. ¶¶ 3, 5. Shibata joined Nikko as Executive Chairman in July 2013, and

4

assumed the roles of Representative Director, President and CEO in April 2014. Shibata Decl. ¶ 2.

In 2009, after SMTB acquired Nikko from Citibank, the Company established a stock option plan (the "2009 Plan") to retain existing employees and attract new talent. FAC ¶ 31-32. Two years later, Nikko established a second plan to advance the same purpose (the "2011 Plan," and together with the 2009 Plan, the "Plans"). *Id.* ¶ 42. SMTB worked with Nikko's senior management team, including Plaintiffs McCarthy and Wilder, to develop the Plans. *Id.* ¶¶ 31, 42. The governing documents for both Plans were substantively identical and included (1) an "Allotment Agreement" signed on behalf of Nikko and by each grantee, and (2) accompanying "Terms and Conditions" describing the Plans. *Id.* ¶¶ 36-41, 43-49. Those documents — including the Allotment Agreements signed by each of the Plaintiffs — were written in Japanese. Defs.' Mot. to Dismiss ("Defs.' Br."), at 2.

Under the Plans' similar terms, Plaintiffs were awarded units of stock acquisition rights ("SARs"), FAC ¶¶ 50-59, which provided for an exercise period of up to 10 years, *id.* ¶¶ 126, 261. In the event the Company did not implement an IPO

5

by a designated date,[1] the Plans granted participants the right to liquidate their vested SARs. *Id.* ¶¶ 248, 261. Specifically, participants would have the option, but not the obligation, to sell their SARs back to Nikko at the "fair market value" of the Company less a pre-identified strike price.[2] *Id.* ¶¶ 35, 43. To calculate "fair market value," the Plans required Nikko to obtain opinions from three independent evaluators twice a year, commencing approximately six months after the designated date. *Id.* ¶ 36-38, 44. In the event Nikko did implement an IPO before the designated date, the process for exercise was more straightforward. Participants were to be granted the right to exercise their SARs at the strike price, and if the market price exceeded the strike price, the participant could reasonably expect to profit from the transaction. *Id.* ¶¶ 34, 43.

Under the terms of both Plans, participants who left the Company prior to exercising their rights were expressly permitted to retain their vested options. The Plans' Terms and Conditions provided that, in the event an employee left after

---

[1]    Namely, January 2015 for the 2009 Plan and October 2016 for the 2011 Plan. FAC ¶¶ 37, 45.
[2]    The strike price for the 2009 Plan was set at 625¥ per share based on the price SMTB paid to acquire Nikko at the height of the financial crisis. FAC ¶ 34. The strike price for the 2011 Plan was considerably higher -- 737¥ per share -- and reflected Nikko's increasing value. *Id.* ¶ 43.

the Company went public, the employee had to exercise his rights within three months of departure. *See* Defs.' Exs. 2, 4, 6. If an employee left before an IPO, he had until three months after the IPO to exercise his rights, provided however that during this three month period, Nikko could require former employees to sell their rights back, thereby allowing Nikko to control the size of the float in a public offering. *See* ECF No. 32-2, Section 2(10)(v)(b). The Plans did not, however, provide that the Company could force a sale *before* an IPO. On the contrary, Section 2(10)(iii) explicitly states that Nikko "must have implemented the IPO at the time of the exercise of the Stock Acquisition Rights." *Id.*

All Plaintiffs were participants in either the 2009 Plan, the 2011 Plan, or both. Plaintiffs began to receive information about their rights under the 2009 Plan in early 2010, and received similar information on the 2011 Plan one year later (the "Allotment Packages"). FAC ¶¶ 10-16. The Allotment Packages were distributed to Plaintiffs at their place of employment, which for the NAMA Plaintiffs was New York City. *Id.* NAMA Plaintiffs also were sent "Award Notices" at or around the same time. *See* Defs.' Exs. 18-19, 20-22.

By the end of 2015, all Plaintiffs had terminated their employment with NAMA or Nikko. FAC ¶¶ 10-16. However, Plaintiffs retained units of SARs under the Plans after departing NAMA or Nikko. *Id.* ¶¶ 121, 151. In addition, upon their termination from NAMA, Hansen and Alfandary each entered into a separation agreement with NAMA and "its current and former parents, subsidiaries, and affiliated entities, and their respective . . . officers, directors and employees" (the "Separation Agreements"). Miller Decl., Ex. 11 ("Hansen Separation Agreement"); *id.* Ex. 12 ("Alfandary Separation Agreement"). The Separation Agreements provide for Defendants' express consent to the "exclusive jurisdiction of the courts of New York County, New York" for "any action regarding" the Agreement. *Id.* The Separation Agreements also contain merger clauses in which the parties agree that the Separation Agreements "supersede[] and cancel[] all prior . . . written and oral agreements" between them. *Id.*

The third NAMA Plaintiff, Vicari, lost her employment file during a residential move, and no longer possesses "any records" relating to "[her] termination of employment with NAMA." Vicari Aff. ¶¶ 15-16. Plaintiffs allege, however, that "it was NAMA's regular business practice to negotiate the terms of separation with each of its departing executives," covering,

among other things, "any vested SARs held in the employee stock option plans." Alfandary Aff. ¶ 36.

According to Plaintiffs, in 2014 and 2015, Shibata represented to members of Nikko's then-senior management that he wanted to "prevent prior management from deriving any value whatsoever from existing employee stock option plans, including the 2009 and 2011 Stock Option Plans." FAC ¶ 68. Shibata also told senior management that he wanted to force existing option holders to forfeit their vested options in order to free up money for a new compensation plan. *Id.* ¶ 70. Shibata indicated to at least one member of senior management, Plaintiff Reidenbach, that he would not allow internal opposition to this endeavor. *Id.* ¶ 71. Furthermore, Plaintiffs allege that SMTB and its parent, SMTH, were "aware of" and "willful participants in" the scheme. FAC ¶¶ 5, 84, 89, 91-94.

To execute this scheme, Defendants first undertook to alter Nikko's valuation process to obtain artificially low valuations of the Company. *Id.* ¶¶ 2, 79. This was accomplished in part by selecting evaluators that Defendants could control, and giving the evaluators limited and inaccurate data, in violation of the terms governing the valuation process set forth in the Plans. *Id.* ¶ 36. As a result, the Company was valued

9

conveniently below the 2009 Plan's strike price, which was calculated during the depths of the great recession, and far less than the 2011 Plan's strike price, which reflected the Company's increased value two years later. *Id.*

By causing the Company's valuation to be set at a figure less than the 2009 and 2011 strike prices, Defendants rendered all vested SARs worthless. *Id.* ¶ 2. To reap the benefits of that effort, Defendants then forced participants to exercise their SARs on these terms. *Id.* ¶ 8. Despite the fact that the Company had not conducted an IPO by the designated dates, Nikko advised 2009 and 2011 Plan grantees that it was willing to buy their SARs in July 2015 and January 2017, respectively. *Id.* ¶ 121, 151. These two offers (the "Purchase Offers") explained that the evaluators decided the fair market value of Nikko shares was less than the relevant strike price,[3] and Nikko was consequently willing to purchase the SARs for ¥1 per share. *Id.* ¶¶ 122-23. The Purchase Offers further explained that, for grantees like Plaintiffs who were no longer employees, the SARs would become unexercisable and extinguished if they did

---

[3] In the July 2015 Purchase Offer, Nikko stated that the Evaluator had valued the Company at ¥617 per share; in the January 2017 Purchase Offer, Nikko offered to repurchase the SARs for ¥1 per share. FAC ¶¶ 122, 151.

not submit a purchase request by a certain date.[4] *Id.* ¶¶ 124, 151.

As a result of the foregoing events, Plaintiffs filed the present action. For the reasons set forth below, Defendants' motion to dismiss is denied in its entirety.

## III. **The Applicable Standard**

"A federal court has discretion to dismiss a case on the ground of *forum non conveniens* 'when an alternative forum has jurisdiction to hear the case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Sinochem Intern. Co. Ltd. v. Malaysia Intern. Shipping Corp.*, 549 U.S. 422, 430 (2007) (citing *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447-48 (1994)) (alteration omitted) (citations omitted). "Dismissal for *forum non conveniens* reflects a court's assessment of a 'range of considerations,

---

[4] For the July 2015 Purchase Offer, the deadline was August 21, 2015; for the January 2017 Purchase Offer, it was March 24, 2017. *Id.* ¶ 124, Ex. 23.

most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality.'" *Id.* at 429 (internal citation omitted). In determining whether dismissal on the ground of *forum non conveniens* is appropriate, "a district court enjoys wide discretion to which substantial deference is given." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981).

In order to avoid dismissal for lack of personal jurisdiction under Rule 12(b)(2), Plaintiffs must establish personal jurisdiction with respect to each Defendant. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1783 (2017). "Where a court has chosen not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981). Accordingly, the pleadings are construed "in the light most favorable to [P]laintiffs." *Pornia v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008).

IV. **The Defendants' Motion to Dismiss the FAC on *Forum Non Conveniens* Grounds is Denied**

Courts reviewing a motion to dismiss for *forum non conveniens* "should begin with the assumption that the plaintiff's choice of forum will stand unless the defendant meets the burden of demonstrating . . . that 'trial in the chosen forum would be unnecessarily burdensome for the defendant or the court.'" *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc) (citing *Piper Aircraft Co.*, 454 U.S. at 256, n.23). Deference owed to a plaintiff's chosen forum is further "fortified" where, as here, "an American Plaintiff brings suit against a foreign entity and the alternative forum is foreign." *David Tunick, Inc. v. Kornfield*, 813 F. Supp. 988, 992 (S.D.N.Y. 1993). Because there is a "strong presumption in favor of the choice of a United States plaintiff to litigate in his home forum," *see Teevee Toons, Inc. v. Gerhard Schubert GMBH*, No. 00 Civ. 5189 (RCC), 2002 WL 498627, at *7 (S.D.N.Y. March. 29, 2002), Defendants bear a particularly "heavy burden" in opposing Plaintiff's chosen forum. *Sinochem Intern. Co. Ltd.*, 549 U.S. at 430.

The first step in the inquiry is to establish the existence of an adequate alternative forum. *Bank of Credit &*

13

*Commerce Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273
F.3d 241, 246 (2d Cir. 2001) (citation omitted). "An alternative
forum is generally adequate if: (1) the defendants are subject
to service of process there; and (2) the forum permits
litigation of the subject matter of the dispute." *Id.* (quoting
*Alfadda v. Fenn*, 159 F.3d 41, 45 (2d Cir. 1998) (quotation marks
omitted). Here, as courts in this circuit have recognized, and
as the Wakabayashi Declaration confirms, Japan is an adequate
alternative forum. *See* Wakabayashi Decl. ¶¶ 7-26; *see also,
e.g., Borden, Inc. v. Meiji Milk Prods. Co., Ltd.*, 919 F.2d 822,
829 (2d Cir. 1990) (explicitly finding there had been adequate
showing of an alternative remedy available in Japanese courts).

Upon this showing, courts determine whether to dismiss
for *forum non conveniens* by considering the private and public
interest factors from *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501,
508-09 (1947) (the "*Gulf Oil* Factors"). "Private interest
factors include: the relative ease of access to sources of
proof; the availability of compulsory process for attendance of
unwilling witnesses; the cost of obtaining attendance of willing
witnesses; and all other practical problems that make trial of a
case easy, expeditious, and inexpensive—or the opposite." *Teevee
Toons, Inc.*, 2002 WL 498627, at *8 (S.D.N.Y. March 29, 2002)

14

(citing *Murray v. British Broad. Corp.*, 81 F.3d 287, 294 (2d Cir. 1996)).

There may also be "questions as to the enforceability [*sic*] of a judgment if one is obtained." *Borden, Inc. v. Meiji Milk Prods. Co., Inc.*, 919 F.2d 822, 827 (2d Cir. 1990) (citation omitted). The "public interest factors include: the administrative difficulties flowing from court congestion; the local interest in having controversies decided at home; the interest in having the trial in a forum that is familiar with the law governing the action; the avoidance of unnecessary problems in conflict of laws or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Teevee Toons, Inc.*, 2002 WL 498627, at *8 (citing *Murray*, 81 F.3d at 293).

Unless the balance of the *Gulf Oil* factors weighs "strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." *Gulf Oil*, 330 U.S. at 508.

A. The Defendants' Motion to Dismiss the Nikko
   Plaintiffs' Claims for *Forum Non Conveniens* is Denied

As to both the private and public interest *Gulf Oil* factors, Defendants have not met their heavy burden. *See Teevee Toons, Inc.*, 2002 WL 498627, at *8.

Regarding the private interest factors, Defendants argue that because Plaintiffs' claims are based upon Defendants' conduct in connection with the valuations of Nikko undertaken pursuant to the Plans, all the witnesses and documents relevant to the dispute are in Japan, and therefore this factor favors the foreign forum. Plaintiffs counter that much of the relevant evidence in this case, including contemporaneous audio recordings illustrating fraud, is already located in New York. Indeed, Defendants' concerns regarding access to evidence are mitigated by current technology. *See Metito (Overseas) Ltd. v. Gen. Elec. Co.*, No. 05 Civ. 9478 (GEL), 2006 WL 3230301, at *6 (S.D.N.Y. Nov. 7, 2006) ("For many years, courts in this Circuit have recognized that modern technologies can make the location of witnesses and evidence less important to the *forum non conveniens* analysis, particularly where the parties are major corporations.").

Defendants have also cited concerns about compelling "unwilling witnesses." Defs' Br. at 19. But neither specific witnesses nor their testimony have been identified, and even if

16

such a list had been provided, "it has not shown why the
testimony of these witnesses could not be obtained in the form
of depositions or letters rogatory." *Hatzlachh Supply v.
Tradewind Airways Ltd.*, 659 F. Supp. 112, 116 (S.D.N.Y. 1987)
(citation omitted); *see also R. Maganlal & Co. v. M.G. Chemical
Co.*, 942 F.2d 164, 169 (2d Cir. 1991) (unavailability of
witnesses not a sufficiently weighty concern to require *forum
non conveniens* dismissal because "any testimony [defendant]
needs from witnesses whose attendance cannot be compelled can be
obtained, for example, through the use of letters rogatory").

Further, Plaintiffs carry the burden of proving their
claims, and any hypothetical inability to obtain testimony from
non-willing witnesses cannot be deemed to weigh in favor of
dismissal. *See Wahl v. Pan Am. World Airways, Inc.*, 227 F. Supp.
839, 841 (S.D.N.Y. 1964) (where plaintiffs "have the burden of
proving their case," defendant is "under no greater hardship
than the plaintiffs in defending the action[]" in the United
States).

There are also cost-shifting considerations. The Nikko
Plaintiffs are individuals while the corporate Defendants are
multi-national financial institutions alleged to have conducted
a major segment of their enterprise in New York City, and as

17

such are comparatively better suited to handle the travel costs

attending to this litigation. *See Wiwa v. Royal Dutch Petroleum

Co.*, 226 F.3d 88, 107 (finding that defendants had not

demonstrated costs of shipping documents from England to the

United States and flying witnesses from Nigeria to New York not

"excessively burdensome, especially in view of the defendants'

vast resources," particularly as "counterbalanced by the cost

and inconvenience to the plaintiff of requiring them to

reinstitute the litigation in England—especially given the

plaintiffs' minimal resources in comparison to the vast

resources of the defendants."). Additionally, the Nikko

Plaintiffs would face a significant added filing expense were

they required to bring this litigation in Japan. Plaintiffs seek

damages in excess of $100 million. Filing the action in Japan

would cost the Nikko Plaintiffs more than $150,000 in filing

fees. *See Calavo Growers of Cal. V. Generali Belgium*, 632 F.2d

963, 969 (2d Cir. 1980) (Newman, J., concurring) ("It will often

be quicker and less expensive to transfer a witness or a

document than to transfer a lawsuit.").


Finally, Defendants cite *Borden, Inc. v. Meiji Milk

Prods. Co., Ltd.*, 919 F.2d 822 (2d Cir. 1990), for support that

there may be a legal obstacle to enforcing in Japan a judgment

rendered in New York. However, *Borden* considered whether

Japanese courts would enforce a preliminary injunction awarded in aid of arbitration, and found that questions regarding enforceability militated in favor of dismissal because "under Japanese law a foreign judgment is not enforceable until final," and the preliminary relief at issue in that case presented an obvious concern. *See Borden, Inc. v. Mieji Milk Prods. Co.*, Inc., No. 90 Civ. 5611 (MJL), 1990 WL 151118, at *4 (S.D.N.Y. Oct. 3, 1990).

Here, the requested relief is monetary and therefore the enforceability considerations proposed by Defendants do not apply. *See* FAC at 79.

On the evidence presented, the balance of the private interest factors weighs in favor of Plaintiffs. *See Direnzo v. Philip Servs. Corp.*, 294 F.3d 21, 31 (2d Cir. 2002) (citation omitted) ("*Gilbert* tells us that unless the balance strongly favors defendant, plaintiffs' choice of forum 'should rarely be disturbed.'").

The public *Gilbert* factors also favor litigation in this forum. First, Defendants do not argue that "administrative difficulties flowing from court congestion" require dismissal. *See Teevee Toons, Inc.*, 2002 WL 498627, at *8. This factor, at

19

worst, is neutral. *See, e.g., In re Citigroup Inc. Sec. Litig.*, No. 09 MD 2070 (SHS), 2014 WL 470894, at *6 (S.D.N.Y. Feb. 6, 2014) ("As for the Southern District of New York, although this District is historically busy, there is no reason to believe that court congestion would slow the place of this litigation."). It is therefore construed to favor litigating in New York given the strong presumption favoring Plaintiffs' choice of their home forum.

The same goes for the public interest factors relating to having local disputes settled locally, having the trial in a forum familiar with the law governing the action, and the interest in avoiding burdening jurors with cases that have no impact on their community. Defendants contend that, "[s]imply put, Japan has a much greater interest in this litigation than does the United States" because the dispute challenges conduct which occurred in Japan, and involves Japanese domiciliaries in relation to a Japanese-law contract and the valuation of a Japanese company. *See* Defs.' Br. 15. What Defendants fail to adequately address is that all of the Nikko Plaintiffs are United States citizens. A New York juror would view the facts no differently than if effected by a New-York based entity.

20

Further, the local interest derived from citizenship and residence is reinforced by the strong national interest that the United States has in enforcing its securities laws. *See generally DiRienzo*, 294 F.3d at 33 (citation omitted) ("Reversal is further warranted in the circumstances presented . . . once the interest of the United States in enforcing its securities laws is factored into the equation."); *see also Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2017 WL 1169629, at *8 (citation omitted) (S.D.N.Y. Mar. 28, 2017) ("[T]hough Chile's interest in this case is significant, the U.S. also has a strong interest in upholding its federal securities laws.").

Nor does the final public interest factor -- "the avoidance of unnecessary problems in conflict of laws or in the application of foreign law," *see Teevee Toons, Inc.*, 2002 WL 498627, at *8 -- support dismissal. Plaintiffs' SEA claims are clearly subject to the laws of the United States. Defendants have already agreed to the application of New York law to the common law claims asserted by Alfandary and Hansen. New York law applies to the NAMA Plaintiffs' common law fraud claims because their injuries were, in large part, suffered in New York. *See In re Thelen LLP*, 736 F.3d 213, 219-20 (2d Cir. 2013) ("[F]or claims based on fraud, the locus of the tort is generally deemed

to be the place where the injury was inflicted, rather than where the fraudulent act originated," and it is the locus of the tort that helps determine which jurisdiction has the greatest interest in the litigation).

This leaves a possible question as to the applicable law with respect to the remaining claims. This lack of clarity as to the remaining claims in itself confirms that this factor is at most neutral. *See Erausquin v. Notz, Stucki Mgmt. (Bermuda) Ltd.*, 806 F. Supp. 2d 712, 716 (S.D.N.Y. 2011) (holding that the forum law factor "does not favor either forum" where the choice of law analysis is "somewhat complicated" in that common law claims raise issues under the laws of various jurisdictions). Indeed, the applicability of Japanese law to certain of the claims does not necessarily override Plaintiffs' choice of their home forum. *See, e.g.*, *R. Maganlal & Co.*, 942 F.2d at 169 ("[I]t is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of *forum non conveniens*."); *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01 Civ. 2946 (AGS), 2002 WL 432390, at *7 (S.D.N.Y. Mar. 20, 2002) (denying dismissal on *forum non conveniens* grounds notwithstanding that case would involve some issues of Norwegian law).

On balance, the *Gulf Oil* Factors can hardly be said to tilt "strongly in favor" of the Defendants here. Defendants' motion to dismiss the Nikko Plaintiffs' claims for *forum non conveniens* is denied.

## B. The Defendants' Motion to Dismiss the NAMA Plaintiffs on *Forum Non Conveniens* Grounds is Denied

The *forum non conveniens* conclusions set forth above with respect to the Nikko Plaintiffs apply equally to the NAMA Plaintiffs, but the analysis is complicated by the Award Notices and the Separation Agreements executed upon termination of employment. *See Lazare Kaplan Intern. Inc. v. KBC Bank N.V.*, 528 F. App'x 33, 36 (2d Cir. 2013) (holding that courts must decide issues regarding enforcement of forum selection clauses before reaching any *forum non conveniens* analysis).

Defendants seek to enforce the forum selection clauses contained in the Award Notices. Defs.' Br. 15-17. They argue that the NAMA Plaintiffs each signed Award Notices acknowledging that their Allotment Agreements are governed by Japanese law, and agreed that "any claim or dispute" regarding those Agreements, the Plans, or the SARs could be heard only in Tokyo District Court. *See* Defs.' Br. 12; Defs.' Exs. 18-22.

The NAMA Plaintiffs contend that in the Separation Agreements, which were entered on a date later than the Award Notices, Defendants agreed to the exclusive jurisdiction of New York for resolution of all disputes among the parties. Pls.' Br. 8, ECF No. 40.

Because the "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system . . . a valid forum-selection clause should be given controlling weight in all but the most exceptional cases." *Atl. Marine Const. Co., Inc. v. U.S. Dist. Court for Western Dist. of Texas*, 571 U.S. 49, 63 (2013) (internal citation omitted). In view of the strong presumption in favor of such provisions, a valid forum-selection clause must be followed absent "extraordinary circumstances unrelated to the convenience of the parties." *Id.* at 62.

In cases like this, where parties have entered into multiple agreements specifying different mandatory forums for dispute resolution, courts must evaluate which forum-selection clause is valid. *See Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822 (2d Cir. 2006) ("Where . . . two sides have put forth

24

different contracts, each containing a forum selection clause designating a different forum, and the parties do not dispute the facts which gave rise to those two conflicting contracts, the court must decide . . . which forum selection clause governs."). The central question is whether the later agreement contains a merger clause that designates it as the document that fully embodies the parties' rights and obligations. *Id.* at 430 (citing *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 526 (2d Cir. 2011) ("Under New York law, it is well established that a subsequent contract regarding the same matter will supersede the prior contract.")). Specifically, "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing." *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 26 (2d Cir. 1988).

Here, the Separation Agreements entered into between Alfandary and Hansen, while slightly different, are substantially similar for purposes of this inquiry.[5] Both

---

[5]  Defendants assert an absence of any record of a Separation Agreement for Vicari. Defs.' Reply Br. at 6.

Separation Agreements contain the following integration clause

(the "Integration Clause"):

> This Agreement constitutes the entire agreement
> between Nikko and you, and supersedes and cancels all
> prior and contemporaneous written and oral agreements,
> if any, between Nikko and you. You affirm that, in
> entering into this Agreement, you are not relying upon
> any oral or written promise or statement made by
> anyone at any time on behalf of Nikko.

*See* Hansen Separation Agreement, Hansen Aff., Ex. A ¶ 9;

Alfandary Separation Agreement, Alfdandary Aff., Ex. C ¶ 13.

Moreover, the Separation Agreements contain the

following identical forum selection clauses:

> This Agreement may not be changed or altered, except
> by a writing signed by Nikko and you. This Agreement
> is entered into in the State of New York, and the laws
> of the State of New York will apply to any dispute
> concerning it, excluding the conflict-of-law
> principles thereof. Furthermore, any action regarding
> this Agreement or its enforcement shall be subject to
> the exclusive jurisdiction of the courts of New York
> County, New York.

*See* Hansen Separation Agreement ¶ 14; Alfandary Separation

Agreement ¶ 18.

Because the later-executed Separation Agreements

contain a merger clause that broadly "supersedes and cancels all

prior and contemporaneous written and oral agreements," the

Separation Agreements are fully integrated. *See Starter Corp. v.*

*Converse, Inc.*, 170 F.3d 286, 295 (2d Cir. 1999) ("Where the

operative agreement contains an express integration, or merger clause, the Second Circuit has found such agreements to be fully integrated."). Indeed, the language in the Integration Clauses clearly states its superseding effect—it would be unreasonable for Plaintiffs to believe otherwise. Accordingly, there is little doubt the Integration Clauses of the Separation Agreements—documents proposed by Nikko—which included express, unambiguous language as to their superseding effect, were in fact intended to supersede conflicting portions of all prior agreements, including the Award Notices.

## V.    **The Defendants' Motion to Dismiss the FAC on Personal Jurisdiction Grounds is Denied**

Plaintiffs bear the burden of establishing personal jurisdiction with respect to each Defendant. *See Bristol-Myers Squibb Co. v. Superior Ct. of Cal.*, 137 S. Ct. 1773, 1783 (2017). However, at this stage, "[P]laintiffs need only make a prima facie showing" of personal jurisdiction, and the pleadings are construed "in the light most favorable to [P]laintiffs." *Pornia v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008).

Because Section 27 of the SEA authorizes service of process "wherever the defendant may be found," it allows the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment. *See, e.g.*, *SEC v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990) (internal citations omitted); *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997) (court sitting under federal question jurisdiction only applies forum state's personal jurisdiction rules "if the federal statute does not specifically provide for national service of process"). "The due process analysis for purposes of the court's *in personam* jurisdiction is basically the same under both the Fifth and Fourteenth Amendments," but under the Fifth Amendment courts can consider the defendant's contacts throughout the United States rather than the forum state only. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 330 (2d Cir. 2016) (citing *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1988)). The Due Process Clause limits the court's power to assert personal jurisdiction over a nonresident defendant, and "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will or will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

28

The due process test for personal jurisdiction has two parts: the "minimum contacts" inquiry and the "reasonableness" inquiry. *See Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996). In evaluating minimum contacts, courts must first determine which jurisdictional authority applies: "specific" or "general" jurisdiction. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

Specific jurisdiction exists when the defendant has "purposefully directed" his activities at residents of the forum, and the litigation results from injuries "aris[ing] out of or relat[ing] to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). In this Circuit, a claim is considered to arise out of or relate to at least one of the defendant's contacts with the forum when there is a substantial connection between the two, such that the assertion of jurisdiction is fair and reasonable. *See Chew*, 143 F.3d at 29. This doctrine is designed to ensure that a foreign defendant is not required to appear as the result of "random, fortuitous, or attenuated contacts" with the forum. *Burger King Corp.*, 471 U.S. at 475.

General jurisdiction, by contrast, exists where the defendant-corporation is "fairly regarded as at home," *Goodyear*, 563 U.S. at 924, including where it has had "continuous and systematic general business contacts," *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416 (1984). General jurisdiction is not limited to claims arising out of or relating to the defendant's contacts with the forum. *Id.*

The reasonableness inquiry requires courts to decide whether asserting personal jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice." *Goodyear*, 564 U.S. at 923 (quoting *International Shoe*, 326 U.S. at 316). Relevant factors include (1) the burden the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *See Chloe v. Queen Bee of Beverly, LLC*, 616 F.3d 158, 173 (2d Cir. 2010). "[T]he exercise of jurisdiction is favored where the plaintiff has made the threshold showing of minimum contacts," though it may be defeated where the defendant makes a compelling showing of unreasonableness. *Metro. Life Ins.*

*Co.,* 84 F.3d at 568. Specifically, the defendant bears the burden of demonstrating that the assertion of jurisdiction in the forum will "make litigation so gravely difficult and inconvenient that [he] unfairly is at a severe disadvantage in comparison to his opponent." *Burger King,* 471 U.S. at 478.

### A. Personal Jurisdiction Exists Over All Defendants As To Claims Brought by Plaintiffs Hansen and Alfandary

At the outset, personal jurisdiction exists over all Defendants as to claims brought by Plaintiffs Hansen and Alfandary. The Separation Agreements executed by NAMA on behalf of Nikko, Shibata, SMTB and SMTH provided for the "exclusive jurisdiction of the courts of New York County, New York" for any claims arising out of their employment. Plfs.' Ex. 11, ¶ 14; Plf. Ex. 12, ¶ 18. Because the Separation Agreements governs *(see supra* at 26-27) Defendants Nikko, Shibata, SMTB, and SMTH have consented to this Court's jurisdiction with respect to the claims asserted by Plaintiffs Hansen and Alfandary.[6] *See generally D.H. Blair & Co., Inc. v. Gottdiener,* 462 F.3d 95, 103 (2d Cir. 2006) ("Parties can consent to personal jurisdiction through forum selection clauses in contractual agreements.")

---

[6] To the extent that Plaintiff Vicari has a separation agreement containing this language, Defendants have consented to jurisdiction with respect to her claim, as well.

(citing *Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315-16 (1964)("parties to a contract may agree in advance to submit to the jurisdiction of a given court[.]").

## B. Personal Jurisdiction Exists Over Defendants Nikko, Shibata, SMTB and SMTH As To All Claims

Putting the Separation Agreements aside, the Court also has personal jurisdiction over Defendants with respect to all claims, because each Defendant has sufficient minimum contacts in the United States and exercising jurisdiction over them would not be unreasonable.

### 1. *Nikko Has Sufficient Minimum Contacts in the United States*

While Nikko is incorporated and maintains its principal place of business in Japan, this Court nonetheless has general jurisdiction over it. Defendants principally rely on *Daimler AG v. Bauman*, 571 U.S. 117 (2014) to support their argument that NAMA's operations in New York may not serve as a basis for asserting general jurisdiction over Nikko. Defs' Mot. at 24. However, in *Daimler*, neither the parent company nor its subsidiary was incorporated or had its principal place of

32

business in the forum. *Id.* at 139. Here, NAMA was incorporated in Delaware and has its principal place of business in New York. FAC ¶ 20. What's more, Nikko's activity in the United States went beyond, for example, sending its CEO to the United States once, accepting American checks, buying equipment in the United States, or sending personnel to the United States for training. *Cf. Helicopteros,* 466 U.S. at 408.

Instead, Plaintiffs have alleged facts demonstrating that Nikko has had continuous and systematic operations in the United States such that it may fairly be considered at home here. Nikko has been registered as an investment adviser firm with the SEC since at least August 1999. FAC ¶ 17. As part of its registration, Nikko has filed with the SEC: (1) a Form ADV; (2) Form 13F reports, which are required for institutional investment managers that use the United States mails and exercise investment discretion over $100 million; and (3) Form PF reports, which are required for SEC-registered investment advisers that have, with their related persons, at least $150 million in private fund assets under management. *See* Sayato Decl., ECF No. 34, ¶ 4.

Nikko also provides investment advisory services in the United States through its wholly owned subsidiary, NAMA. *See*

*id.* ¶¶ 4, 12, FAC ¶ 17. In NAMA's own Form ADV, dated June 29, 2017, Nikko is listed as its majority owner and control person. FAC ¶ 20. Two of Nikko's ten board members sit on the board of NAMA. Sayato Decl. ¶ 13. From 2009 to 2012, Nikko repeatedly sent senior executive from Tokyo to NAMA's New York office to "among other things, answer questions regarding and otherwise discuss the 2009 Stock Option Plan with NAMA employee-participants." *See* FAC ¶ 58. In connection with the Plans, Nikko sent grants of stock to at least 39 employees in the United States. Sayato Decl. ¶¶ 14-15. In sum, Nikko's contacts go beyond merely "doing business" in the United States and demonstrate that Nikko may fairly be considered "at home" here. *Daimler*, 134 S. Ct. at 762 n.20.

Even in the absence of general jurisdiction, specific jurisdiction exists over Nikko because Plaintiffs' claims arise from allegedly fraudulent conduct that Nikko purposefully directed to the United States. As an initial matter, Nikko granted the SARs at issue as part of a deliberate effort to "provide for the long-term welfare of Company employees, and to incentivize" its global employees, including those in New York. FAC ¶ 32. As part of the 2009 and 2011 Plans, Nikko awarded SARs to at least 39 New York employees residing in the United States. FAC ¶ 33. Furthermore, in July 2015 and January 2017, Nikko sent

the Purchase Offers from its Tokyo offices to grantees with SARs under the 2009 and 2011 Plans, including those in New York.[7] FAC ¶¶ 121, 128.

Defendants contend that cases such as *Walden v. Fiore*, 571 U.S. 277 (2014), foreclose a finding of specific jurisdiction over Nikko. But in *Walden*, the defendant's conduct occurred entirely in another forum, and his only contact with the forum state resulted from the plaintiffs' fortuitous choice to reside there. *See* 571 U.S. at 288 (noting the defendant had "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone" to the forum state).

Here, by contrast, the FAC alleges that Nikko's scheme was accomplished in substantial part by purposefully directing fraudulent correspondence to former Nikko and NAMA employees in the United States, including in New York, New Jersey, Nevada, and California. *See* FAC ¶¶ 128-34. Significantly, these Purchase Offers are alleged to contain the fraudulent valuation that is the very cause of Plaintiffs' injury. *See, e.g., Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 169 (2d Cir. 2015)

---

[7]    That Nikko sent similar or identical Purchase Offers to former employees in other countries does not lessen its purposeful contacts with the United States. *See Chloe*, 616 F.3d at 171.

(specific jurisdiction where defendant mailed one debt collection notice, engaged in one debt collection phone call, and mailed a summons and complaint to forum); *In re Sterling Foster & Co., Inc., Sec. Litig.*, 222 F. Supp. 2d 289, 302 (E.D.N.Y. 2002) (personal jurisdiction where "telephone calls with the plaintiff in Texas form the very basis of his complaint"); *O'Connor v. Sandy Lane Hotel Co., Ltd.*, 496 F.3d 312, 317 (3d Cir. 2007) (personal jurisdiction over foreign defendant who mailed seasonal newsletters and traded phone calls with Pennsylvania citizens); *Rambo v. Am. S. Ins. Co.*, 839 F.2d 1415, 1418 (10th Cir. 1988) ("even a single letter . . . to the forum [] may meet due process standards," and that the "exercise of jurisdiction depends on the *nature* of those contacts").

In addition to sending the Purchase Offers to Plaintiffs in the United States, other circumstances further indicate that Defendants could reasonably anticipate being sued here. Even if Nikko's extensive relationship with New York did not *directly* give rise to Plaintiffs' present claims, it clearly *relates* to this litigation. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 128 (2d Cir. 2002) (noting that certain contacts, while not directly giving rise to cause of action, certainly "relate[d] to" it, and are therefore relevant to specific jurisdiction analysis). For one, the

Purchase Offers directly related to SARs that were provided to Nikko and NAMA employees as part of a strategic campaign to, among other things, "incentivize" employees in New York. *See* FAC ¶¶ 31-32. Plus, Plaintiffs are all American citizens. It was hardly "fortuitous" or "random" that Plaintiffs were residing in the United States when they received their Purchase Offers.[8] This is therefore not a case where "unilateral activity of those who claim some relationship with a nonresident defendant" is sought to form the basis for asserting personal jurisdiction. *Hanson v. Denckla*, 357 U.S. 235, 251 (1958).

Based on these facts and others contained in the pleadings and papers attached thereto, Nikko has sufficient minimum contacts in the United States to exercise personal jurisdiction over it.

> *2. Shibata Has Sufficient Minimum Contacts in the*
> *United States*

---

[8]   While Plaintiffs' residence is not dispositive in a jurisdiction analysis, it is nonetheless relevant. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 780 (1984) ("Plaintiff's residence may well play an important role in determining the propriety of entertaining a suit against the defendant in the forum").

The Court may likewise exercise personal jurisdiction over Defendant Shibata. The facts suggest that Shibata purposefully availed himself of the benefit of doing business in this forum, and could reasonably have anticipated litigating claims here.

In 2014, Shibata became the President and CEO of Nikko. FAC ¶ 17. In that role, Shibata was intimately involved in business operations and management in the United States, including by directing and controlling the issuance and repurchase of the stock options to Plaintiffs in the United States. *Id.* ¶¶ 41, 80, 121 (describing Shibata as "de facto plan administrator"). As part of that effort, Shibata himself sent and signed the allegedly fraudulent Purchase Offers from Tokyo to former employees in the United States, including California, Nevada, New York, and New Jersey. *See id.* ¶¶ 128-34. These documents were signed by Shibata personally on Nikko letterhead. *Id.* ¶ 121. In the course of his tenure as President and CEO of Nikko, Shibata also "directed a number of [Nikko] senior executives" to travel to New York in preparation for the stock Plans. *Id.* ¶ 59.

Shibata is further alleged to have personally "orchestrated [the] fraudulent scheme to distort and rig the

outcome" of the Plans by, among other things, handpicking "independent" evaluators and drafting their engagement letters in such a way as to limit the available data from which they would render a valuation. *Id.* ¶¶ 108, 215. This conduct, according to Plaintiffs, caused their injuries in the United States. *See id.* ¶¶ 157-270.

In sum, Shibata was directly involved the scheme that caused Plaintiffs' harm—a scheme that could not have been successfully executed without taking certain actions in the United States. Shibata's contacts with this forum thus have a substantial connection to Plaintiffs' claims. *See, e.g., Landry v. Price Waterhouse Chartered Accountants*, 715 F. Supp. 98, 102 (S.D.N.Y. 1989) (personal jurisdiction where defendant was "control person" of company and "possessed knowledge that the [transaction at issue] would have an impact . . . both within and without the United States"); *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013) (personal jurisdiction where nonresident defendant executed dozens of wire transfers, which enabled completion of plaintiffs' alleged harm, through account in New York).

### 3. SMTB and SMTH Have Sufficient Minimum Contacts
### in the United States

Finally, personal jurisdiction may be exercised over
SMTB and SMTH. The allegations in the pleadings suggest SMTB and
SMTH purposefully availed themselves of the benefits of doing
business in the United States.

"Courts in this Circuit have recognized the conspiracy
theory of personal jurisdiction, which allows the acts of a co-
conspirator to be attributed to a defendant for the purpose of
obtaining personal jurisdiction over the defendant." *In re
Satyam Computer Services Ltd. Sec. Lit.*, 915 F. Supp. 450, 484
(S.D.N.Y. 2013) (internal citations omitted). To establish
jurisdiction on a conspiracy theory, Plaintiffs must: (1) make a
*prima facie* showing of a conspiracy; (2) allege specific facts
warranting the inference that the defendant was a member of the
conspiracy; and (3) show that the defendant's co-conspirator
committed a tortious act pursuant to the conspiracy in this
jurisdiction. *See Allstate Life Ins. Co. v. Linter Group Ltd.*,
782 F. Supp. 215, 221 (S.D.N.Y. 1992).

To make a *prima facie* showing of conspiracy to violate
federal securities laws, Plaintiffs must demonstrate (a) a

primary violation of the securities laws by another; (b) an agreement between the alleged defendant conspirator and the primary violator to violate the securities laws; (c) an illegal or fraudulent act committed by the alleged conspirator in furtherance of the conspiracy; and (d) damage to a person not a member of the conspiracy. *Id.* at 221-22.

Here, the FAC alleges substantive violations of the Securities Exchange Act by Nikko and Shibata. FAC ¶ 9. Additionally, Plaintiffs have asserted that there was agreement between Defendants to engage in this fraud, because SMTB and SMTH executives were aware of and approved of Shibata's plan to eliminate the stock option plans through a falsified valuation process. *See id.* ¶ 218. The FAC further alleges that SMTB and SMTH took specific actions in furtherance of the conspiracy, for example, by working with Nikko's senior management to select the evaluators and by encouraging the fraud after becoming aware of it. *Id.* ¶ 193. Finally, the FAC alleges damage to Plaintiffs, who were not members of this conspiracy. *Id.* ¶ 222. As such, the first element of "conspiracy theory" jurisdiction has been satisfied.

The FAC contains specific facts warranting the inference that SMTB and SMTH were members of the conspiracy. For

41

example, the FAC makes clear that SMTB and SMTH had extensive control over Nikko and Shibata. SMTB attained 100% ownership of Nikko in 2009, and SMTB is in turn controlled by SMTH. *See* Defs.' Exs. 17-19. SMTB exercised direct operational control over Nikko and NAMA. For example, the SMTB directors on Nikko's board of directors were actively involved in approving Nikko's budget and overseeing Nikko's daily operations, as well as those of NAMA. FAC ¶ 18. More importantly, SMTB and SMTH executives were allegedly supportive of Shibata's fraudulent scheme by enabling Nikko to "create a new, more lucrative incentive plan for [] Shibata without unduly diluting" SMTB and SMTH's ownership interest in Nikko. *Id.* ¶¶ 4-5. *Cf. Allstate Life Ins. Co.*, 782 F. Supp. at 223 (finding this element satisfied where defendants benefitted from co-conspirator's fraudulent act).

Lastly, Plaintiffs have shown that SMTB and SMTH's co-conspirator committed a tortious act pursuant to the conspiracy in the United States. Plaintiffs claim they were harmed by the Purchase Offers, which contained Nikko's fraudulent valuation. The overarching scheme, of which these Purchase Offers were a critical part, was developed by Nikko executives, including Shibata. Shibata signed the Purchase Offers himself and sent them from Tokyo to Plaintiffs in the United States for

42

completion. Thus, the facts permit assertion of personal jurisdiction over SMTB and SMTH pursuant to a conspiracy theory.

Even without the conspiracy theory of personal jurisdiction, the *Calder v. Jones* "effects test" provides an alternative basis for jurisdiction. 465 U.S. 783 (1984). Under the "effects test" theory, specific personal jurisdiction exists over defendants whose conduct "occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff." *See Licci ex rel. Licci*, 732 F.3d at 173 ("It should hardly be unforeseeable to a bank that selects and makes use of a particular forum's banking system that it might be subject to . . .a lawsuit in that forum for wrongs related to and arising from that use."). While "harmful effects alone will not establish jurisdiction," where a defendant "expressly aim[s] his conduct in the United States," specific personal jurisdiction exists. *See, e.g., In Re Platinum and Palladium Antitrust Litig.*, No. 14 Civ. 9391, 2017 WL 1169626, at \*42 (S.D.N.Y. March 28, 2017); *Waldman*, 835 F.3d at 337.

The above-described conduct of SMTH and SMTB, including the exercise of operational and managerial control over Nikko and NAMA from Japan, as well as their participation

in and support of the fraudulent repurchase scheme, was "expressly aimed" at the United States. *See In Re Platinum and Palladium Antitrust Litig.*, 2017 WL 1169626, at \*42. For example, the stock plans at issue were an effort, approved by SMTH and SMTB, to "incentivize" employees worldwide to, among other things, "stay on with the Company." *See* FAC ¶ 32. Moreover, the allegedly fraudulent valuation and repurchase of the stock options was aimed at preventing dilution of SMTH and SMTB's ownership in Nikko. *See id.* ¶ 194. There is little doubt, then, as to the geographical "focal point" of the conduct at issue. *See Calder*, 465 U.S. at 789. Because the employee stock plans were issued to, and repurchased from, employees in New York, the "effects" of such conduct was to be felt in New York. *See id.* Under these circumstances, where Defendants are alleged to be primary participants in a fraudulent scheme aimed at New York, specific personal jurisdiction is properly exercised.

### 4. It Is Reasonable to Exercise Personal Jurisdiction Over All Defendants

Finally, like most courts conducting the reasonableness inquiry after finding that a defendant has adequate minimum contacts, this Court concludes that "this is

not the rare case where the reasonableness analysis defeats the exercise of personal jurisdiction." *S.E.C. v. Straub*, 921 F. Supp. 2d 244, 259 (S.D.N.Y. 2013). First, while perhaps not convenient for Defendants to litigate this action in the United States, there has been no showing that doing so would be gravely difficult. On the contrary, the facts suggest that traveling to and doing business in the United States is a regular activity for Defendants. Second, this forum has strong interests in adjudicating this case, given that this claim was brought pursuant to federal law. *See id.* at 259. Third, Plaintiffs have a serious interest in obtaining convenient and effective relief. They are all American citizens, and have asserted they will face hefty filing fees should they be forced to litigate in Japan, meaning Defendants could potentially evade liability altogether. Fourth, litigating Plaintiffs' claims in this forum will not be inefficient for reasons similar to those discussed in the *forum non conveniens* analysis above. Finally, there being no obvious "substantive social policies" implicated, the fifth factor is neutral.

In light of the above, personal jurisdiction may be exerted over Nikko, Shibata, SMTB and SMTH.[9] Defendants' motion to dismiss for lack of jurisdiction is denied.

## I.    Conclusion

For the foregoing reasons, the Defendants' motion to dismiss is denied.

It is so ordered.

**New York, NY**
**October 4, 2018**

ROBERT W. SWEET
U.S.D.J.

---

[9]    The doctrine of pendent personal jurisdiction allows a district court to assert personal jurisdiction over the parties to state-law claims, even if personal jurisdiction is not otherwise available, so long as a federal statute authorizes nationwide service of process and the federal and state-law claims derive from a common nucleus of operative fact. *See Charles Schwab Corp. v. Bank of America Corp.*, 883 F.3d 68, 88 (2d Cir. 2018) (citing *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1056 (2d Cir. 1993)). Because the Court finds that personal jurisdiction exists for all Defendants with respect to the SEA claims, as set out above, it may therefore exercise personal jurisdiction over the related state-law claims alleged in the FAC.