```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
CHRISTINA ALFANDARY, JEFFREY HANSEN, :
LAURIE VICARI, TIMOTHY MCCARTHY,    :
BILL WILDER, FREDERICK REIDENBACH,  :
AND GREGORY ATKINSON,               :
                                    :
             Plaintiffs,            :    17-cv-5137 (LAP)
                                    :
     -against-                      :
                                    :    OPINION AND ORDER
                                    :
NIKKO ASSET MANAGEMENT, CO., LTD.,  :
TAKUMI SHIBATA, SUMITOMO MITSUI     :
TRUST BANK, LIMITED, AND SUMITOMO   :
MITSUI TRUST HOLDINGS, INC.,        :
                                    :
             Defendants.            :
                                    :
------------------------------------x
```

LORETTA A. PRESKA, Senior United States District Judge:

Plaintiffs Christina Alfandary ("Alfandary"), Jeffrey Hansen ("Hansen"), Laurie Vicari ("Vicari"), Timothy McCarthy ("McCarthy"), Bill Wilder ("Wilder"), Frederick Reidenbach ("Reidenbach"), and Gregory Atkinson ("Atkinson") (collectively, "Plaintiffs") bring this action pursuant to the Securities Exchange Act ("SEA") and various state laws in an effort to enforce certain stock acquisition rights ("SARs"). (See generally Amended Complaint ("Am. Compl."), dated Sep. 20, 2017 [dkt. no. 19].) Defendants Nikko Asset Management Co., Ltd. ("Nikko"), Takumi Shibata ("Shibata"), Sumitomo Mitsui Trust Bank, Limited ("SMTB"), and Sumitomo Mitsui Trust Holdings, Inc.

1

("SMTH") (collectively, "Defendants") have moved to dismiss the Amended Complaint, dated September 20, 2017 [dkt. no. 18], in its entirety, pursuant to Federal Rules of Civil Procedure 12(b)(6). (See Notice of Motion (the "Motion to Dismiss"), dated Dec. 14, 2018 [dkt no. 64]; Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Mem. Supp."), dated Dec. 14, 2018 [dkt no. 65]; Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Reply Mem."), dated Mar. 29, 2019 [dkt. no. 70].)

Based on the foregoing conclusions, the Motion to Dismiss is GRANTED.

I. **BACKGROUND**

A. **Facts**

Detailed descriptions of the underlying facts have been set forth in two prior Opinions. (Opinion, dated Oct. 4, 2019 [dkt no. 52]; Opinion, dated June 19, 2019 [dkt no. 78].) Consequently, the Court assumes familiarity with the facts and describes them only briefly for purposes of resolving the instant motion.

Defendant Nikko is a privately-held investment advisor and asset manager headquartered in Japan. (Am. Compl. ¶ 17.) Defendant SMTB is an institutional investment manager that owns 91.6% of Nikko. (Id. ¶¶ 18.) As part of that ownership, SMTB

2

supervises and controls Nikko's business operations and consolidates Nikko's financial results with its own. (Id. ¶¶ 17-18.) SMTB's shares are in turn wholly owned by Defendant SMTH; most of SMTH's officers are also officers or executives of SMTB. (Id. ¶ 19.) Defendant Shibata was Nikko's Chief Executive Officer. (Id. ¶ 1.)

Plaintiffs are former senior executives of either Nikko or its New York-based wholly owned subsidiary, Nikko Asset Management of America, Inc. ("NAMA"). (Id. ¶¶ 10-16.)

Sometime after its acquisition of Nikko, SMTB began working with Nikko's senior management team to create stock option plans that were designed to retain existing employees and attract new talent. (Id. ¶¶ 29-32, 42.) The result of this endeavor was the establishment of two stock option plans, one in 2009 (the "2009 Plan") and another in 2011 (the "2011 Plan") (together, the "Plans"), pursuant to which Nikko or NAMA employees, including Plaintiffs, were awarded units of stock acquisition rights ("SARs"). (Id. ¶ 31, 42, 50-59.) The Plans' governing documents, which were virtually identical, included (1) an "Allotment Agreement" signed on behalf of Nikko and by each grantee, and (2) accompanying "Terms and Conditions" describing the Plans. (Id. ¶¶ 36-41, 43-49.)

At issue in this action are the Plans' terms regarding participants' ability to exercise their rights and Nikko's

3

rights to force participants to sell back their vested SARs. The Plans provide the following.

The SARs could be exercised for a period of up to 10 years. (Id. ¶¶ 126, 261.) In the event that Nikko did not implement an Initial Public Offering ("IPO") by a designated date—January 2015 for the 2009 Plan, and October 2016 for the 2011 Plan—participants had the option, but not the obligation, to sell their vested SARs back to Nikko. (Id. ¶¶ 37, 45, 248, 261.) If a participant opted to liquidate his or her SARs, Nikko would buy them at the "fair market value" of the Company less a pre-identified strike price. (Id. ¶¶ 35, 43.) To calculate its "fair market value," Nikko was required to obtain opinions from three independent evaluators twice per year, commencing approximately six months after the designated date for an IPO. (Id. ¶¶ 36-38, 44.) In the event that Nikko did implement an IPO before the designated date, participants would be granted the right to exercise their SARs at the pre-identified strike price, and if the market price exceeded the strike price, participants could expect to profit from the transaction. (Id. 34, 43.)

Participants who left Nikko prior to exercising their SARs were expressly permitted to retain their vested options, subject to certain restrictions that would be triggered if the Company went public. (Id. ¶ 126.) Specifically, the former employee

4

would have until three months after the IPO to exercise his rights, provided however that during this three-month period, Nikko could force the former employee to sell his rights back. (Id. ¶ 127.) The terms also stated that if, "on or prior to the last day of such period[,]" Nikko granted option holders the opportunity to request that Nikko purchase their SARs, the SARs would become "unexercisable as of the purchase date . . . specified by [Nikko]."[1] (Defs.' Exs. 2, 4, & 6 [dkt. nos. 66-2, 66-4, 66-6], §2(10)(v)(b)(x).)

All Plaintiffs were participants in either the 2009 Plan, the 2011 Plan, or both. (Am. Compl. ¶¶ 10-16.) Plaintiffs began to receive information about their rights under the 2009 Plan in early 2010, and received similar information on the 2011 Plan one year later (the "Allotment Packages"). (Id.) By the end of 2015, all Plaintiff had terminated their employment with NAMA or Nikko but retained units of SARs pursuant to the Plans' terms. (Id. ¶¶ 10-16, 121, 151.)

According to Plaintiffs, in 2014 and 2015, Defendant Shibata represented to members of Nikko's then-senior management

---

[1] Defendants contend that "on or prior to the last day of such period" "necessarily includes the period of time before an IPO[.]" (Defs.' Mem. Supp. at 4.) Plaintiffs, however, disagree and point to Section 2(10)(iii), which explicitly states that Nikko "must have implemented the IPO at the time of the exercise of any of the [SARs]." (See Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss ("Pls.' Mem. Opp."), dated Feb. 27, 2019 [dkt. no. 68], at 3.)

5

that he wanted to "prevent prior management from deriving any value whatsoever from existing employee stock option plans, including the 2009 and 2011 [Plans]." (Id. ¶ 68.) Shibata also told senior management that he wanted to force existing option holders to forfeit their vested options in order to free up money for a new compensation plan. (Id. ¶ 70.) Shibata indicated to at least one member of senior management, Plaintiff Reidenbach, that he would not allow internal opposition to this endeavor. (Id. ¶ 71.) According to Plaintiffs, Defendant SMTB and Defendant SMTH were "aware of" and "willful participants in" the scheme. (Id. ¶¶ 5, 84, 89, 91-94.)

To execute this scheme, Defendants first altered Nikko's valuation process to obtain artificially low valuations of the Company. (Id. ¶¶ 2, 79.) This was accomplished by selecting evaluators that Defendants could control, as well as giving the evaluators limited and inaccurate data, allegedly in violation of the terms governing the valuation process set forth in the Plans. (Id. ¶ 36.) Consequently, Nikko was valued below the 2009 Plan's strike price, which was calculated during the depths of the recession, and far less than the 2011 Plan's strike price, which reflected the Company's increased value two years later. (Id.) Plaintiffs allege that Defendants thus rendered all vested SARs worthless. (Id. ¶ 2.)

6

Next, Defendants forced participants to exercise their SARs on these terms. (Id. ¶ 8.) Although Nikko had not conducted an IPO by the designated dates, it advised 2009 and 2011 Plan grantees that it was willing to buy their SARs in July 2015 and January 2017, respectively. (Id. ¶ 121, 151.) These two offers (the "Purchase Offers") explained that the evaluators calculated the fair market value of Nikko shares to be less than the relevant strike price,[2] and that Nikko was consequently willing to purchase the SARs for ¥1 per share. (Id. ¶¶ 122-23.) The Purchase Offers further explained that, for grantees like Plaintiffs who were no longer employees, the SARs would become extinguished if they did not submit a purchase request by a certain date. (Id. ¶¶ 124, 151.)

On September 20, 2017, Plaintiffs filed their 81-page Amended Complaint asserting ten causes of action: (1) Plaintiff Hansen against Defendants Nikko and Shibata for violations of Section 10(b) of the SEA ("Section 10(b)") and Rule 10(b)(5) promulgated thereunder ("Rule 10(b)(5)"), in connection with the SARS granted under the 2009 Plan; (2) all Plaintiffs against Defendants Nikko and Shibata for violations of Section 10(b) and Rule 10(b)(5), in connection with the SARs granted under the

---

[2] In the July 2015 Purchase Offer, Nikko stated that the evaluator had valued the Company at ¥617 per share; in the January 2017 Purchase Offer, Nikko offered to repurchase the SARs for ¥1 per share. (Id. ¶¶ 122, 151.)

7

2011 Plan; (3) all Plaintiffs against Defendant Shibata for violations of Section 20 of the SEA ("Section 20"); (4) all Plaintiffs against Defendants SMTB and SMTH for violations of Section 20; (5) all Plaintiffs against Defendants Nikko and Shibata for common law fraud; (6) all Plaintiffs against Defendants SMTB and SMTH for aiding and abetting common law fraud; (7) all Plaintiffs against all Defendants for conspiracy to commit common law fraud; (8) all Plaintiffs against Nikko for breach of contract, namely, the 2009 Allotment Agreement; (9) Plaintiffs Alfandary, Hansen, Reidenbach, and Atkinson against Defendant Nikko for breach of contract, namely, the 2011 Allotment Agreement; and (10) for declaratory judgment against all Defendants. (See Am. Compl. ¶¶ 157-270.)

On December 20, 2017, Defendants moved to dismiss the Amended Complaint on the grounds of *forum non conveniens* and lack of personal jurisdiction. (Notice of Defendants' Motion to Dismiss the Amended Complaint, dated Dec. 20, 2017 [dkt. no. 30].) Judge Sweet denied that motion in its entirety by Opinion dated October 4, 2018 [dkt. no. 52]. Defendants then moved for reconsideration of that decision. (Notice of Defendants' Motion for Reconsideration of October 4, 2018 Opinion Denying Defendants' Motion to Dismiss the Amended Complaint ("Motion for Reconsideration"), dated Oct. 18, 2018 [dkt. no. 55].) The action was subsequently transferred to this Court, which denied

Defendants' motion for reconsideration by Opinion dated June 19, 2019 [dkt. no. 78].

As noted above, presently before the Court is Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) [dkt no. 64].

II. **LEGAL STANDARD**

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). To survive a Rule 12(b)(6) motion to dismiss, the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). Put differently, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such

9

allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" Munoz-Nagel v. Guess, Inc., No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)). However, the pleadings "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Twombly, 550 U.S. at 555 (citation and internal quotation omitted).

In resolving a motion to dismiss, courts may consider not only the documents attached to the complaint as an exhibit or incorporated in it by reference, but also documents that were "integral to the plaintiff's claim," so long as the plaintiff had notice of their contents. Cosmas v. Hassett, 886 F.2d 8, 13 (2d Cir. 1989).

## III. DISCUSSION

### 1. The Section 10(b) Claims

To state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." Ganino v. Citizens Utilities Co., 228 F.3d

154, 161 (2d Cir. 2000) (citing In re Carter-Wallace, Inc. Sec. Litig., 150 F.3d 153, 155-56 (2d Cir.1998).

Defendants argue, inter alia, that the SARs are not "securities" as defined by the SEA; that Plaintiffs, other than Hansen with respect to his 2009 SARs, failed to plead that they entered into a purchase or sale in connection with, or in reliance on, Defendants' misrepresentations; and that all Plaintiffs have failed to show causation.

The Court is inclined to agree with Plaintiffs that the SARs may be considered securities. The SEA contains a broad definition of the term "security," which includes financial instruments such as: "stock . . . participation in any profit-sharing agreement . . . investment contract . . . option . . . privilege on any security . . . or right to subscribe to or purchase[] any of the foregoing." 15 U.S.C. § 78(c)(a)(10). The Plaintiffs contend that the SARs are options or rights to purchase stock and are therefore clearly securities. (Pls.' Mem. Opp. at 6.) According to Defendants, however, employee stock options are only "securities" for purposes of the SEA if the contract pursuant to which they were granted was an "investment contract" as defined in Int'l Brotherhood of Teamsters, v. Daniel, 439 U.S. 551, 558 (1979). (Defs.' Mem. Supp. at 9-10.) The Court disagrees that Daniel and its progeny mandate such a conclusion.

Daniel held that an employee's participation in a non-contributory, compulsory pension plan is not the equivalent of purchasing a security. Daniel, 439 U.S. at 558. In the context of employee stock options, Daniel seems to suggest only that plaintiffs may not rest their securities claims on the mere acquisition of such options pursuant to a non-contributory, compulsory benefit plan. See, e.g., In re Lehman Bros. Holdings Inc., 855 F.3d 459, 476 (2d Cir. 2017) ("Daniel . . . focused on whether employees made an investment decision that could be influenced by fraud or manipulation"); In re Satyam Computer Servs. Ltd. Sec. Litig., 915 F. Supp. 2d 450, 471 (S.D.N.Y. 2013) ("[Standing could not be established] based on the mere acquisition of options under [an employee benefit plan]"); In re Cendant Corp. Sec. Litig., 76 F. Supp. 2d 539, 550 (D.N.J. 1999) ("Under the SEC's 'no sale' doctrine, a grant of securities to an employee pursuant to a stock bonus plan is not a 'purchase' or 'sale' because these employees do not individually bargain to contribute cash or other tangible or definable consideration to such plan [and] employees in almost all instances would decide to participate if given the opportunity") (internal quotation marks and citations omitted); Egan v. TradingScreen, Inc., 2011 WL 4344067, at *8 (S.D.N.Y. Sep. 12, 2011) ("[A]n acceptance of stock options and grants in exchange for continued employment does not constitute the

12

purchase of a security.") (citations omitted); <u>Lampkin v. UBS Financial Servs., Inc.</u>, 925 F.3d 727, 736 (5th Cir. 2019) ("[The plaintiffs'] theory that option grants fall outside the purview of the no-sale doctrine is contradictory: the affirmative investment decision is made when the employees decide whether to exercise their options, but their claims are explicitly based only on the grant of the options.") Here, Plaintiffs' claims under the SEA relate not to Defendants' grant of the SARs but to Plaintiffs' affirmative decision regarding whether or not to sell back their SARs at the allegedly fraudulent value. The Court does not read <u>Daniel</u> to suggest that such transactions are beyond the scope of the SEA.

Nonetheless, Plaintiffs claims fail on other grounds.

First, aside from Hansen with respect to the SARs he was granted under the 2009 Plan, none of the Plaintiffs has alleged that he or she actually sold his or her SARs after receiving the Purchase Offers. On the contrary, they allege that they refused Nikko's offer to buy the SARs because they disbelieved the valuation as false. (Am. Compl. ¶¶ 137-40, 153-53.) Recognizing the lack of any personal reliance in connection with these refusals, Plaintiffs contend that their SEA claims are viable because the <u>evaluators</u> relied on Defendants' misleading information to calculate a fraudulently low valuation for Nikko, which was then communicated by Defendants to Plaintiffs as part

13

of their single scheme to strip the SARs of all value. (Pls.' Mem. Opp. at 9.) In support of this argument, Plaintiffs invoke Vine v. Beneficial Finance Co., 374 F.2d 627 (2d Cir. 1967), which involved a Section 10(b) claim brought by a minority shareholder who was squeezed out in a short-form merger. (Pls.' Mem. Opp. at 7-9.) The plaintiff alleged that the acquiring company misled other shareholders of the acquired company by publishing misstatements in its tender offer, which in turn permitted the acquiring company to amass sufficient stock to complete a short-form merger. Vine, 374 F.2d at 631-32. The court held (i) the minority shareholder could be deemed a "seller" because the defendant gave him no choice but to exchange his shares (or own stock in a non-existent company); (ii) that the deception was "in connection with" the forced sale of the plaintiff's shares because the plaintiff "would never be in the position of a forced seller were it not for the fraud"; and (iii) that the plaintiff adequately pleaded reliance because there was deception that misled other stockholders and this was "in fact the cause of [the] plaintiff's claimed injury." Id. at 635.

Plaintiffs' citation to Vine and similar cases is unpersuasive, however. To begin, it is debatable whether Vine remains good law after Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083 (1991). Moreover, the court's reasoning in Vine

14

was clearly tied to the context of that case, namely, a short-form merger. See id. ("Whatever need there may be to show reliance in other situations . . . we regard it as unnecessary in the limited instance when no volitional act is required and the result of a forced sale is exactly that intended by the wrongdoer.") (internal citations omitted) (emphasis added). In light of this, and given that Plaintiffs have provided no authority extending Vine to more analogous circumstances, the Court declines to apply its logic here.

But in any case, none of the Plaintiffs—including Hansen with respect to the sale of his 2009 SARs—has alleged a sufficient connection between any misrepresentations and the Plaintiff's harm.[3] As Plaintiffs themselves note, deceiving the evaluators was not Defendants' only step in accomplishing their scheme; after misleading the evaluators and receiving the fraudulent valuation, Defendants then were required to force Plaintiffs to choose between selling back their SARs at the

---

[3] The Supreme Court has recognized that reliance "ensures that, for liability to arise, the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury exists as a predicate for liability." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 159 (2008) (internal quotation marks and citations omitted); cf. Suez Equity Invr's L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95-96 (2d Cir. 2001) ("Transaction causation [in a Rule 10b-5 claim] is based upon the plaintiff's reliance upon the defendant's [deception]; that is, but for such conduct by the defendant, the plaintiff would not have acted to his detriment.").

15

evaluators' price and not selling them back at that value, in which case Nikko would extinguish their SARs. In essence, then, the issue in this case is whether Defendants breached the terms of the Plans by manipulating the valuation process and forcing a sale of the SARs before an IPO. (See, e.g., Pls.' Mem. Opp. at 9 (noting that Defendants had to communicate the fraudulent valuation "to Plaintiffs in order to strip their SARs of all value [either by] inducing Plaintiffs to sell for next to nothing, or causing them not to sell, which caused Defendants to extinguish those SARs at no cost to [Nikko]; Id. at 10 (arguing that Hansen pleaded causation because he "was defrauded when, instead of following the contractually mandated procedure to determine the fair market value of the shares, Defendants engaged in a scheme to rig the share price for their proposed transaction").) The connection between Plaintiffs' harm and Defendants' alleged misrepresentations is simply too remote to satisfy reliance or causation.

Ultimately, Section 10(b) and Rule 10b-5 are designed to "protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate." Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 943 (2d Cir. 1984). Here, it can hardly be said that any

16

of the Plaintiffs was "tricked" into parting with his or her SARs. Rather, Plaintiffs' hands were forced by virtue of Defendants' interpretation of the relevant contractual terms. Whether or not Defendants violated their contractual obligations, however, is not a question suited for resolution under federal securities law. Cf. Kramer v. Time Warner, Inc., 937 F.2d 767, 776 (2d Cir. 1991) (stating that a plaintiff "may not transform [a] state law breach of contract or fiduciary duty action into a fraud claim under the federal securities laws"); Drexel Burnham Lambert Inc. v. Saxony Heights Realty Assocs., 777 F. Supp. 228, 235 (S.D.N.Y. 1991) (granting dismissal of securities fraud claim where it was merely a "contract dispute dressed up in the language of fraud").

For the foregoing reasons, Plaintiffs' Section 10(b) and Section 20 claims are dismissed. See, e.g., Solow v. Citigroup, Inc., 827 F. Supp. 2d 280, 293 (S.D.N.Y. 2011) (noting that failure to plead a primary violation of the securities laws mandates dismissal of control person claim).

### 2. Common Law Fraud and Breach of Contract Claims

The court will exercise supplemental jurisdiction over Plaintiff's state law claims.

That Plaintiff's remaining claims arise under state law "does not require automatic dismissal for lack of subject matter jurisdiction." Olle v. Columbia Univ., 332 F. Supp. 2d 599, 620

17

(S.D.N.Y. 2004), aff'd, 136 F. App'x 383 (2d Cir. 2005). The district court "'may, at its discretion, exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction.'" Parker v. Della Rocco, 252 F.3d 663, 666 (2d Cir.2001) (quoting Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir.1996)). The statutory authority for the exercise of such supplemental jurisdiction is found in 28 U.S.C. § 1367(c)(3), according to which a district court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . [it] has dismissed all claims over which it has original jurisdiction," as is the case here. 28 U.S.C. § 1367(c)(3).

When deciding whether to exercise supplemental jurisdiction over state law claims, the court should consider "factors such as judicial economy, convenience, fairness, and comity." Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998) (quoting Nowak, 81 F.3d at 1191).

Here, the claims arise out of the same operative facts, which concern the "the same compensation policies and practices of [the Defendants]." Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 245 (2d Cir. 2011); see also, Treglia v. Town of Manlius, 313 F.3d 713, 723 (2d Cir.2002) (exercise of supplemental jurisdiction was proper where plaintiff's state and federal claims arose "out of approximately the same set of

events"). Further, declining jurisdiction over the state-law claims in this case would further "neither fairness nor judicial efficiency." Mauro v. S. New England Telecommunications, Inc., 208 F.3d 384, 388 (2d Cir. 2000). There would likely be "hardship to [all] parties should plaintiff[s] be forced to re-file in state court." Kroshnyi v. U.S. Pack Courier Servs., Inc., 771 F.3d 93, 102 (2d Cir. 2014). Dismissing these claims would require that defendants be re-served and would require the re-submission of motions by both sides.

Further, the state law claims here do not require this Court to resolve "novel or unsettled issues of state law." Mauro, 208 F.3d at 388; see also Kroshnyi, 771 F.3d at 102 (finding that where the state-law issues at hand were not "so groundbreaking as to preclude the exercise of jurisdiction," the court has found grounds for exercising supplemental jurisdiction.).

For the foregoing reasons, this Court will exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

**IV. CONCLUSION**

For the foregoing reasons, the Motion to Dismiss [dkt. no. 64] is GRANTED.

Counsel shall confer and inform the Court by letter no later than October 15 how they propose to proceed.

SO ORDERED.

Dated:  New York, New York

September 30, 2019

*Loretta A. Preska*
_____
LORETTA A. PRESKA
Senior United States District Judge